*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0353p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: TRAVEL AGENT COMMISSION
ANTITRUST LITIGATION.

_____

TAM TRAVEL, INC., et al.,
                    *Plaintiffs-Appellants,*

            *v.*

DELTA AIRLINES, INC., et al.,
                    *Defendants-Appellees.*

> No. 07-4464

Appeal from the United States District Court for the
Northern District of Ohio at Cleveland.
No. 03-30000—Peter C. Economus, District Judge.

Argued: October 24, 2008

Decided and Filed: October 2, 2009

Before: MERRITT, BOGGS, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Joseph M. Alioto, Jr., Thomas Paul Pier, ALIOTO LAW FIRM, San Francisco, California, for Appellants. Peter K. Huston, LATHAM & WATKINS, San Francisco, California, James A. Reeder, Jr., VINSON & ELKINS L.L.P., Houston, Texas, Lee H. Simowitz, BAKER & HOSTETLER, Washington, D.C., for Appellees. **ON BRIEF:** Joseph M. Alioto, Jr., Thomas Paul Pier, Joseph Alioto, Sr., ALIOTO LAW FIRM, San Francisco, California, for Appellants. James A. Reeder, Jr., Lauren J. Harrison, Elizabeth A. Pannill, VINSON & ELKINS L.L.P., Houston, Texas, for Appellees.

GRIFFIN, J., delivered the opinion of the court, in which BOGGS, J., joined. MERRITT, J. (pp. 22-28), delivered a separate dissenting opinion.

1

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.  Plaintiff travel agencies appeal the district court's dismissal of their Amended Complaint for failure to state a claim under § 1 of the Sherman Antitrust Act.  Plaintiffs allege that defendants conspired to reduce, cap, and eventually eliminate the payment of base commissions in a concerted effort to drive plaintiffs out of business in violation of 15 U.S.C. § 1.  We affirm.  In doing so, we hold that plaintiffs' claims against United Airlines were discharged in bankruptcy and that plaintiffs' claims against the remaining defendants failed to allege sufficient facts to plausibly suggest a prior illegal agreement.

I.

A.

Plaintiffs are the owners of forty-nine travel agencies engaged in the business of selling defendants' airline services.[1]  When a plaintiff sold an airline ticket before 2002, it received a sales commission from the servicing airline that equaled a percentage of the purchased ticket price.  This practice, commonly referred to as the payment of "base commissions," was industry-wide.

Plaintiffs allege a § 1 conspiracy based on a series of uniform base commission cuts adopted by defendants over a seven-year period.  According to plaintiffs, each defendant's decision to match its competitors' base commission cut was the product of defendants' prior illegal agreement to eliminate the practice of paying all base commissions – a result achieved in March 2002.

---

[1]The following airlines were named as defendants in plaintiffs' Amended Complaint:  Air Canada, Alaska Airlines, Inc. ("Alaska"), Alaska Air Group, Inc. ("AAG"), ATA Airlines, Inc., American Airlines, Inc., America West Airlines, Inc., Continental Airlines Inc., Delta Air Lines, Inc., Hawaiian Airlines, Inc., Horizon Air Industries, Inc., Frontier Airlines, Inc., KLM Royal Dutch Airlines, Northwest Airlines, Inc., United Airlines, Inc., US Airways, Inc., and US Airways Group, Inc.

Plaintiffs assert the conspiracy began in 1995, when Delta, American, Northwest, United, and Continental each announced a $25 cap on base commissions for one-way domestic tickets and a $50 cap for round-trip domestic tickets. Plaintiffs further contend that United's decision to cut its base commission rate on September 18, 1997, from 10% of the purchased ticket price to 8% is further evidence of the alleged illegal agreement because American, Delta, Northwest, US Airways, Continental, and America West each matched United's commission cut on or before September 29, 1997. On March 31, 1998, Frontier Airlines announced that it, too, would reduce its base commission rate from 10% to 8%, as did Alaska Airlines on September 30, 1997.

Plaintiffs allege that defendants' conspiracy continued into mid-November 1998, when United imposed base commission caps of $50 and $100 for one-way and round-trip international airfare, respectively. By December 2, 1998, American, Delta, Continental, Northwest, and US Airways each adopted United's $50 and $100 base commission caps.

Almost one year later, on October 7, 1999, United instituted its third commission cut, reducing its base commission rate from 8% to 5% on all domestic and international flights. American, Delta, Northwest, Continental, and US Airways each adopted United's 5% commission cut by the following week. America West and Alaska each matched United's 5% commission cut on October 18, 1999, as did Frontier in November 1999.

On August 17, 2001, American implemented base commission caps of $10 for one-way tickets and $20 for round-trip tickets, effective the following day. Within ten days, United, Delta, Northwest, Continental, US Airways, and America West each adopted American's $10 and $20 caps. Frontier and Alaska followed suit on September 4, 2001, and November 1, 2001, respectively.

Finally, on March 14, 2002, Delta announced that it would eliminate its practice of paying base commissions to travel agencies for both domestic and international airfare, effective immediately. Within ten days, American, United, Northwest,

Continental, US Airways, and America West likewise eliminated the payment of base commissions. Frontier and Alaska followed suit in late May 2002.

Plaintiffs allege that each defendant's decision to cut, cap, and eventually eliminate its practice of paying travel agencies a base commission would not have occurred without collusion because such action, if taken independently, was contrary to the individual defendant's economic self-interest. Plaintiffs point to United's unsuccessful attempt to cut base commission rates in 1981 and American's similar failed attempt in 1983 as evidence of collusion in the present case. In addition, plaintiffs' Amended Complaint refers to the deposition of a former American Airlines executive, Michael Gunn, who testified that "industry consensus" was necessary for industry-wide commission cuts to hold. Gunn also testified that "he had to match commission cuts exactly or he would undercut the movement." Plaintiffs assert that Gunn's statements are persuasive evidence of defendants' common motive to conspire.

As additional support for the alleged conspiracy, plaintiffs point to several meetings where defendants had an opportunity to conspire, including committee meetings of the International Air Transport Association in 1997 and 1998, as well as industry meetings such as the "Conquistadores Del Cielo" (Conquerors of the Sky), the Air Transport Association, the Japan Air Summit, the British Air Summit, the Paris Air Show, the Alex Brown Transportation Conference, the International Aviation Symposium, and the Merrill Lynch conference. Plaintiffs do not identify defendants' attendees by name or title.

More specifically, the Amended Complaint asserts that "in mid-1999 an Executive Vice-President of Marketing & Distribution for Northwest Airlines, a Senior Vice President of Planning for US Airways, and a Senior Vice President of Marketing for American met for three hours in a Dallas hotel conference room." Plaintiffs further allege that "[i]n 2001, a Delta senior executive met for a weekend of golf and socializing at the home of an American executive responsible for setting American's commission levels."

By May 31, 2002, each defendant had eliminated its practice of paying travel agencies a base commission. In addition, several defendants filed for and have emerged from Chapter 11 bankruptcy, including Delta, Northwest, and United.[2]

### B.

On April 9, 2003, plaintiff Tam Travel, Inc. and forty-eight other travel agencies filed a complaint against defendants for illegally agreeing to cap, cut, and eliminate base commissions in violation of § 1 of the Sherman Antitrust Act. 15 U.S.C. § 1.[3] On September 13, 2007, plaintiffs had dismissed defendants US Airways and US Airways Group from the suit without prejudice. On September 14, 2007, the district court determined that the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), could impact the present case and allowed plaintiffs to file an Amended Complaint. On September 28, 2007, several defendants filed a joint motion to dismiss the Amended Complaint under FED. R. CIV. P. 12(b)(6).

On October 29, 2007, the district court granted defendants' motion to dismiss, ruling that: (1) plaintiffs failed to allege any conduct other than sporadic parallel conduct regarding America West, Alaska, Frontier, and Horizon; (2) plaintiffs failed to allege any parallel conduct as to KLM; (3) the emergence of Northwest, United, and Delta from bankruptcy discharged plaintiffs' claims; (4) with regard to Continental and United, plaintiffs failed to aver sufficient facts to plausibly suggest an illegal agreement under *Twombly*;[4] and (5) with regard to AAG, a holding company that does not itself pay commissions, plaintiffs failed to allege any facts.

---

[2]For the purposes of this appeal, only United's bankruptcy is relevant. United filed its Chapter 11 bankruptcy petition on December 9, 2002, and the bankruptcy court confirmed its reorganization plan on January 20, 2006.

[3]Plaintiffs opted out of the putative class in *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652 (E.D.N.C. 2003).

[4]The district court unintentionally omitted American from its identification of "remaining Defendant airlines" for the purposes of this holding. It is clear from the substance of the opinion however, that the district court did not intend to suggest that claims against American were any more meritorious than against Continental and United.

Plaintiffs filed a timely motion for reconsideration, which the district court denied on March 13, 2008. This appeal followed.[5]

II.

Plaintiffs first contend that the district court erred when it ruled that their § 1 claims against United were discharged by the bankruptcy court. By operation of the Bankruptcy Code, confirmation of a reorganization plan "discharges the debtor from any debt that arose before the date of . . . confirmation." 11 U.S.C. § 1141(d). Section 101(12) of the Bankruptcy Code defines a "debt" as "liability on a claim." Pursuant to 11 U.S.C. § 101(5), a "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, [or] unmatured."

The district court ruled that because United filed for bankruptcy in December 2002 and its reorganization plan was not confirmed until January 2006, United's emergence from bankruptcy discharged any liability on claims that arose before its reorganization. Because plaintiffs alleged that United made its last commission cut in March 2002, the district court dismissed plaintiffs' claims against United as discharged debt under 11 U.S.C. § 101(5).

As a preliminary matter, plaintiffs' brief does not challenge the district court's decision to dismiss United under 11 U.S.C. § 101(5), other than to mention in a single sentence that "[e]ach of these airlines emerged from bankruptcy before Travel Agents filed their complaint." Moreover, the record and the Amended Complaint refute this assertion. Because plaintiffs present only a perfunctory argument regarding United's dismissal under 11 U.S.C. § 101(5), plaintiffs have waived this argument. *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) (issues adverted to in a perfunctory

---

[5]After the parties filed their appellate briefs, we were notified that Frontier and ATA filed for Chapter 11 bankruptcy under 11 U.S.C. § 362(a)(1). The filing of a bankruptcy petition operates as an automatic stay of the continuation of a judicial action against the debtor. *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 921 n.1 (6th Cir. 2005) (automatic stay under § 362(a)(1) applies to appellate proceedings). Following oral argument, we also accepted the stipulated dismissal of defendants Delta, Northwest, and KLM.

manner, unaccompanied by some effort at developed argumentation, are deemed waived).  In any event, we find no error in the district court's ruling that United's potential liability qualified as discharged debt under 11 U.S.C. § 101(12).

Plaintiffs assert that United is nonetheless liable under a continuing violation theory because United allegedly rejoined the conspiracy after emerging from bankruptcy in 2006.  Specifically, plaintiffs contend that United's decision to "continue" the "conspiracy commission rate" (which, at this point, was 0%) after its reorganization created a new § 1 claim under the Sherman Act.

As a general rule, a successfully reorganized debtor under Chapter 11 of the Bankruptcy Code is liable for any independent conduct that arises after the confirmation of its bankruptcy plan.  *In re WorldCom, Inc.*, 546 F.3d 211, 221 (2d Cir. 2008); *O'Loghlin v. County of Orange,* 229 F.3d 871, 875 (9th Cir. 2000).  In short, the debtor gets a fresh start, but that "does not [provide] a continuing license to violate the law." *Id.*  In the present case, the district court concluded that United's post-reorganization 0% commission policy did not create a new § 1 claim because its decision was "merely a reaffirmation of a previous act."

Plaintiffs rely on *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), to argue that United's conduct qualifies as a continuing violation.  The *Klehr* case, however, did not involve a formerly bankrupt corporation.  *Id.* at 186.  *Klehr* simply reiterates that the antitrust laws recognize continuing violations and, more precisely, that a new § 1 claim arises each time a company sells a price-fixed product.  *Id.* at 188.

We have held that an "antitrust cause of action accrues … each time a defendant commits an act that injures the plaintiff's business." *DXS, Inc. v. Siemens Med. Sys.*, *Inc.*, 100 F.3d 462, 467 (6th Cir. 1996) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)).  "[T]he focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the *effects* of the overt acts." *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (per curiam) (emphasis added).  "[T]he fact that [] injuries have a rippling effect into the future only establishes that [plaintiffs] might have been entitled to future damages . . . ." *Id.*

Here, we reject plaintiffs' attempt to characterize United's decision to maintain its 0% commission policy as an overt act. "Since the Supreme Court decided *Zenith*, federal courts have uniformly defined a continuing antitrust violation as one in which the plaintiff's interests are repeatedly invaded." *Peck,* 894 F.2d at 849 (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (internal quotation marks and alterations omitted)). Although United's participation in the alleged conspiracy would certainly create a rippling effect, plaintiffs assert that United's final act to effectuate that conspiracy occurred in 2002, long before United emerged from bankruptcy. We also cannot ignore the consequence of concluding that an overt act occurred under these facts. If we were to adopt plaintiffs' continuing violation theory, the applicable limitations period for a § 1 claim would be infinite – an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct. We therefore hold that the district court properly dismissed plaintiffs' claims against United.

### III.

We review de novo the district court's dismissal of plaintiffs' Amended Complaint under FED. R. CIV. P. 12(b)(6). *Johnson v. City of Detroit*, 446 F.3d 614, 618 (6th Cir. 2006). In *Twombly*, the Supreme Court held that a complaint alleging violations under § 1 of the Sherman Act cannot survive a motion to dismiss unless it avers facts that raise a reasonable expectation that discovery will reveal evidence of an illegal agreement. *Twombly*, 550 U.S. at 556. In the wake of *Twombly*, allegations of parallel conduct and bare assertions of conspiracy no longer supply an adequate foundation to support a plausible § 1 claim. *Id.*

Specifically, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and "state a claim to relief that is plausible on its face." *Id.* at 570. Of course, we must still "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (internal quotation and citation omitted). "Yet, to survive a motion to

dismiss, the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). "We need not accept as true legal conclusions or unwarranted factual inferences," *Jones*, 521 F.3d at 559 (alteration and internal citation omitted), and "[c]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson*, 510 F.3d at 634 (internal citation omitted).

A.

Allegations of concerted action by competitors are frequently based on a pattern of uniform business conduct, which courts often refer to as "conscious parallelism." Conscious parallelism, however, is not in itself prohibited under § 1 of the Sherman Act. As the Supreme Court explained in *Twombly*:

> Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984), "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," *Theatre Enters. v. Paramount Film Distrib. Corp.*, 346 U.S. [537, 540 (1954)]. While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id.* at 540-41. Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not itself unlawful." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).
>
> The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust-conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, *see Theatre Enters.*, *supra*; proof of a § 1 conspiracy must include evidence tending to

exclude the possibility of independent action, *see Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

*Twombly*, 550 U.S. at 554 (some internal citations omitted).

The *Twombly* decision provides an additional safeguard against the risk of "false inferences from identical behavior" at an earlier stage of the trial sequence – the pleading stage. A district court's early assessment of the sufficiency of a § 1 claim under FED. R. CIV. P. 12(b)(6) or FED. R. CIV. P. 12(c) addresses the dilemma of the extensive litigation costs associated with prosecuting and defending antitrust lawsuits. As the *Twombly* Court acknowledged, "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Id.* at 558 (internal citation and quotation marks omitted).

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), the Supreme Court explained the *Twombly* decision as follows:

> [In *Twombly*], we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775 (1984), the plaintiffs in *Twombly* flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete with one another." 550 U.S., at 551 (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct . . . to prevent competition" and inflate prices was indicative of the unlawful agreement alleged. *Ibid.* (internal quotation marks omitted).
>
> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so[,] it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth. *Id.,* at 555. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed

the "nub" of the plaintiffs' complaint – the well-pleaded, nonconclusory factual allegation of parallel behavior – to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id.*, at 565-566. *Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. Id.* at 567. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. *Id.*, at 570.

*Id.* (emphasis added).

B.

Plaintiffs first argue that *Twombly* is distinguishable because their Amended Complaint "makes independent allegations of actual agreement." Plaintiffs contend that ¶¶ 90, 91, and 121 independently allege an illegal agreement. In ¶ 121, plaintiffs use the word "agreement," asserting that "the conduct of Defendants described hereinabove, and . . . the *agreement* between and among Defendants to reduce, cap and eliminate commissions paid to plaintiffs" violates the Sherman Act. (Emphasis added.) This averment is nothing more than a legal conclusion "masquerading" as a factual allegation. *See Eidson*, 510 F.3d at 634. The Supreme Court rejected a similar argument in *Twombly*, holding that "a few stray statements speak[ing] directly of agreement . . . are merely legal conclusions resting on [] prior allegations." *Twombly*, 550 U.S. at 564.

Paragraphs 90 and 91 of the Amended Complaint assert that defendants' executives, who were "responsible for [] setting [] commission levels . . . met frequently during the period of cuts and caps," which "afforded these persons the opportunity to . . . conspire" and "communicate[] with one another for the purpose of . . . implementing . . . their common plan . . . ." These allegations, however, aver only an opportunity to conspire, which does not necessarily support an inference of illegal agreement. In fact, ¶¶ 90 and 91 are located in a section of the Amended Complaint entitled "Opportunities for Defendants to Combine and Conspire." We conclude that plaintiffs' attempt to distinguish *Twombly* on the basis that plaintiffs allege "actual agreement" fails.

C.

Next, plaintiffs argue that the district court erred when it dismissed their § 1 claim against Alaska, AAG, Horizon, and America West because the Amended Complaint contained more than bare assertions of conspiracy and parallel conduct. We disagree.

In each of the four references to Alaska in the Amended Complaint, plaintiffs allege only that Alaska adopted uniform commission cuts in 1997, 1999, 2000, and 2001. The Amended Complaint does not contain any factual allegations to support Alaska's involvement in the conspiracy, beyond its parallel behavior. America West is also referred to four times but, like Alaska, plaintiffs allege parallel conduct alone and fail to aver facts sufficient to implicate America West in any conspiracy.

AAG and Horizon are also named defendants and parties to this appeal, but neither is mentioned in the body of the Amended Complaint, nor do plaintiffs specify how these defendants are involved in the alleged conspiracy. Consequently, if these "defendant[s] [sought] to respond to plaintiffs' [] allegations in the § 1 context, [they] would have little idea where to begin." *Twombly*, 550 U.S. at 564 n.10.

Plaintiffs attempt to implicate these defendants in the purported conspiracy by relying on several vague allegations contained in the Amended Complaint that refer to "defendants" or "defendants' executives." However, plaintiffs' reliance on these indeterminate assertions is misplaced because they represent precisely the type of naked conspiratorial allegations rejected by the Supreme Court in *Twombly*. *See Twombly*, 550 U.S. at 565 n.10 (stating that where "complaint [] furnishes no clue" as to which defendants supposedly agreed or when and where the illicit agreement took place, the complaint fails to give adequate notice as required by Fed. R. Civ. P. 8). "A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 557. For these reasons, we hold that the district court

properly dismissed  plaintiffs' § 1 claim against Alaska, AAG, Horizon, and America West.  Thus, only defendants Continental and American remain.

D.

Finally, plaintiffs argue that factual allegations in their Amended Complaint raise a reasonable expectation that discovery will reveal circumstantial evidence sufficient to suggest an antitrust conspiracy similar to that present in *Interstate Circuit v. United States*, 306 U.S. 208 (1939).  In this regard, plaintiffs' Amended Complaint alleges that:

> Each Defendant knew that concerted action to reduce and cap commissions was contemplated and invited.  Each Defendant adhered to the common scheme to reduce and cap commissions and participated in it.  Each Defendant was advised that every other Defendant was invited to participate.  Each Defendant knew that cooperation was essential to successful operation of the plan.

In *Interstate Circuit*, the Supreme Court held that a pattern of uniform admission ticket prices at subsequent-run theaters was sufficient to permit a fact-finder to infer the existence of an illegal agreement.[6]  Plaintiffs focus on the following language of *Interstate Circuit*:

> Each was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions for any given territory there was risk of a substantial loss of the business and good will of the subsequent-run and independent exhibitors, but that with it there was the prospect of increased profits.

306 U.S. at 222.

However, plaintiffs fail to acknowledge the salient evidence of unlawful collusion presented in *Interstate Circuit*.  Specifically, in *Interstate Circuit*, a Texas movie theater chain sent an identical letter to eight major movie distributors threatening

---

[6]We recognize that *Interstate Circuit* was decided at a more advanced stage of the legal process, and we do not suggest that the same standards ought to be applied on a motion to dismiss, even under *Twombly*.  However, plaintiffs argue that they have alleged enough factual matter "to raise a reasonable expectation that discovery will reveal" circumstantial "evidence of illegal agreement," *Twombly*, 550 U.S. at 556, analogous to the circumstantial evidence discovered in *Interstate Circuit*.  Thus, we examine plaintiffs' complaint with an eye to any factual allegations that would make it "reasonable" to "expect []" that similar circumstantial evidence would surface during discovery.  *Id.*

to discontinue showing their films if the distributors did not require all subsequent-run theaters to charge a minimum admission price of twenty-five cents. *Id.* at 216-17. The admission price customarily charged in independently operated subsequent-run theaters in Texas at that time was less than twenty-five cents. *Id.* at 217. Soon thereafter, each distributor required all subsequent-run theaters showing their films to charge a minimum of twenty-five cents.

The Supreme Court concluded that Interstate Circuit's letter, which listed all eight distributors as addressees, provided uncontested evidence that each distributor knew about the involvement of the others and constituted persuasive evidence of a conspiracy, particularly because the defendants could offer no alternative reason for their parallel pricing demands. *Id.*

Plaintiffs point to the Airline Reporting Corporation ("ARC"), which is an information clearinghouse for airlines. The ARC provides information on ticket distribution, reporting and settlement services, and base commission rates paid to travel agents. However, there is no allegation in the Amended Complaint that ARC could provide defendants with commission reduction information *before* defendants implemented their rate reductions. According to the Amended Complaint, every leader airline (the first to announce and implement a commission cut) publicly announced its cut and implemented the change almost immediately. Thus, defendants' access to ARC does not suggest a viable means to collude on commission rates before such reductions occurred.

In *Monsanto Co. v. Spray-Right Service Corp.,* 465 U.S. 752, 768 (1984) (emphasis added), the Supreme Court established the modern standard to evaluate evidence bearing on concerted action:

> The correct standard is that there must be evidence that tends to exclude the possibility of *independent* action . . . . That is, there must be direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

We applied this standard in *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), wherein the plaintiff, a national real estate brokerage franchiser, sued two local real estate firms, alleging a violation of § 1 of the Sherman Act.[7]  Under the local firms' adverse-splits policy, whenever Re/Max agents were involved in a transaction, defendants paid them only 25 or 30 percent of the commission, rather than the industry norm of a 50/50 split.  Re/Max alleged that the adverse-splits policy, the means by which defendants controlled the market for hiring real estate agents, violated § 1.  173 F.3d at 1010.  Re/Max claimed that the adverse-splits policy lowered its sales revenue and prevented it from recruiting knowledgeable and experienced sales agents because both defendants adopted a policy that paid its agents less than the industry norm.  *Id.*

We reversed the district court's grant of summary judgment in favor of the defendants, holding that the plaintiff provided sufficient circumstantial evidence tending to exclude the possibility of independent conduct.  *Id.* at 1025.  We concluded the following "plus factors" were important when evaluating circumstantial evidence of concerted action:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire.  Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct.

*Id*. at 1009 (internal citation omitted).

Key to our decision in *Re/Max* was evidence that use of the adverse-splits policy would not be in either defendant's *independent* economic interest.  If only one defendant adopted the policy, Re/Max agents would simply deal with the other defendant, and thus

---

[7]We note that *Re/Max Int'l, Inc.* was an appeal from a grant of summary judgment.  Here, our review is constrained by Fed. R. Civ. P. 12(b)(6).  Nonetheless, plaintiffs argue they have put forth factual allegations that would make it reasonable to expect that discovery will reveal evidence of the *Re/Max* "plus factors."  This analysis is instructive insofar as it illuminates the plausibility of defendants' lawful, unchoreographed free-market behavior.

sales and revenue would shift away from one defendant to the other. *Id.* at 1010-11. Moreover, even if one defendant adopted the "adverse splits policy *on its own* (a 'highly unlikely' event in the first place)," the other local real estate firm had a strong incentive not to do likewise. *Id.* Thus, we concluded that the local firms' decision to adopt the adverse-splits policy, despite a natural inclination *not* to do so, was persuasive evidence of prior agreement. *Id.*

Citing *Re/Max*, plaintiffs assert that no rational airline would attempt to cut commission rates without entering into a prior agreement because the leader airline would lose revenue to its competitors. In support of this position, plaintiffs point to American's unsuccessful attempt to cut base commission rates from 10% to 7% in 1983 and United's similar attempt to reduce base commission rates in 1981. Plaintiffs assert that both airlines quickly retracted their base commission cuts because the travel agencies retaliated by booking their customers on airlines that maintained the status quo commission rate. Plaintiffs contend that when one of defendants' competitors announced a base commission cut, each defendant had a strong incentive not to adopt that cut because its natural economic inclination would be to absorb any revenue shifted away from its competitor.

First, Michael Gunn, former Executive Vice President of Marketing and Planning at American, testified that an independent reduction in commission rates would advance each defendant's economic self-interest. Each defendant could have calculated reasonably that a successful commission cut would yield greater net revenue than the likely net loss due to business  diverted by plaintiffs to their competitors. This decision is especially plausible in a marketplace that has changed fundamentally since 1983 due to technological advances in airline ticket purchasing. Defendants contend that new, alternate methods for airfare purchase – including direct purchases by customers on the internet – provided a greater economic incentive to cut commission rates on a trial-and-error basis. Defendants also assert that it was simple and inexpensive for a leader airline to innovate and then wait and see, with the hope and expectation that its competitors would institute similar cuts. If the industry did not follow, the leader airline could

simply retract the cut. Thus, defendants have offered a reasonable, alternative explanation for their parallel pricing behavior. In addition, if we follow plaintiffs' argument to its logical end, it is difficult to imagine a scenario where a commission cut could *ever* occur without collusion. Based on these facts, we conclude that each defendant had a reasonable, independent economic interest in adopting a competitor's commission cut rather than to maintain the status quo.

We therefore hold that plaintiffs have failed to allege sufficient facts plausibly suggesting (not merely consistent with) an agreement in violation of § 1 of the Sherman Act because defendants' conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Ashcroft v. Iqbal*, 129 S. Ct. at 1950.[8] Pursuant to *Twombly*, district courts must assess the plausibility of an alleged illegal agreement *before* parties are forced to engage in protracted litigation and bear excessive discovery costs. *Twombly*, 550 U.S. 558-59. In this regard, we note that the plausibility of plaintiffs' conspiracy claim is inversely correlated to the magnitude of defendants' economic self-interest in making the cuts.[9] *See Matsushita*, 475 U.S. at 57 (defining ambiguous evidence as that which is as consistent with permissible competition as with illegal conspiracy). We are not persuaded by plaintiffs' argument that defendants would not seek to reduce base commissions independently, especially during the late 1990s and into 2002, where changes in the marketplace provided consumers with alternate ticket-purchasing options. As the Court stated in

---

[8]We note that plaintiffs opted-out of a class action that alleged an identical § 1 claim against these defendants. *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652 (E.D.N.C. 2003), *aff'd sub nom. Hall v. Am. Airlines, Inc.*, 118 F. App'x 680 (4th Cir. 2004). In *Hall*, the district court granted summary judgment in favor of defendants, finding "overwhelmingly compelling evidence that the commission cuts and caps . . . were just as likely the result of competitive conduct and natural changes in the market as of the illegal conspiracy alleged by plaintiffs." *Id.* at 671. Although a district court decision affirmed by the Fourth Circuit is not authoritative in the Sixth Circuit, we think that the result in *Hall* is something we should at least consider (when analyzing plausibility), "both for its persuasive power, and because it involves the same facts." *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 367 (7th Cir. 1987) (citation omitted) (considering Fourth Circuit decision in antitrust action involving defendants whose activities spanned more than one court of appeals). We also acknowledge the Seventh Circuit's statement in *Premier*, which warned, "[o]nly the gravest reasons should lead [a] court in [an] opt-out suit to come to a conclusion that departs from that in the class suit." *Id.* at 367-68.

[9]Defendants assert that "each percentage point reduction in travel agent commissions was worth approximately $56 million, and that by 2002, the combined value of the commission cuts was more than a billion dollars."

*Twombly*, "there is no reason to infer that [these defendants] had agreed among themselves to do what was only natural anyway." 550 U.S. at 566.

Next, plaintiffs rely upon ¶ 87 of their Amended Complaint, which includes an excerpt from the deposition of Michael Gunn. Gunn testified that "industry consensus" on new commission levels was necessary for the commission cuts and caps to hold. Gunn also testified that "he had to match commission cuts exactly or he would undercut the movement." Plaintiffs argue that Gunn's testimony provides strong evidence of an antecedent agreement. We disagree.

The district court reviewed Gunn's deposition testimony in its entirety and carefully considered all of the factual allegations which, taken as true, could plausibly imply that defendants entered into a preceding agreement. After doing so, the district court ruled that there were insufficient facts to raise a reasonable expectation that discovery would reveal evidence of an illegal agreement. In reaching its conclusion, the district court noted the importance of the following portion of Gunn's testimony:

> Q. [Mr. Alioto (counsel for plaintiff)]: It was, in fact, represented to you by another person at American that in order for these reductions of commissions to work that you had to get common agreement of the industry; that was the most important thing?
>
> A. [Mr. Gunn]: I would respond again that my belief is you have to be matched if the cut is to be [successful]. But I don't know I don't care if there's a common agreement or other. All I care about is how people behave if I do something or how I believe if they do something. To me that's not consensus. That's taking a common action after the fact which is to me a lot different than consensus. Consensus speaks to prior agreement. There certainly wasn't any prior agreement in these cases.

Based on the facts alleged by plaintiffs, it is just as likely that American's 2001 commission cap was an effort to reduce its internal commission costs, with the ancillary hope that its competitors would follow its lead. As stated by a respected antitrust authority:

> When one oligopolist raises its price, each of its rivals must decide whether to follow. Continuing the previous price would allow each of

the others to increase its sales if the leader persists in charging a higher price.  But each knows that the leader is likely to retract an increase that is not followed.  Accordingly, each rival asks itself whether it is better off at the lower price when it is charged by all or at the higher price when charged by all.  If the latter, as will often be the case, the leader's price increase is likely to be followed.

* * *

The price leader may assume that others have made a similar calculation about which price will maximize profits.  Or the leader may simply proceed by trial and error:  raise the price and see what happens, especially where reversing an unfollowed price rise is not very costly.

6 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1410b (2d ed. 2003).

In addition, the matching of American's 2001 commission cap by the other defendants is not necessarily indicative of prior agreement.  On this issue, the Seventh Circuit has observed that:

[a] firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader.  After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all.  One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992).  Thus, each defendant's decision to match a new commission cut was arguably a reasoned, prudent business decision.  Moreover, if each defendant asked "itself" whether it was "better off" paying base commissions (paid by all) or not paying base commissions (eliminated by all), each defendant would plausibly elect the latter (from a purely economic standpoint).

Plaintiffs also argue that their factual allegations regarding defendants' opportunities to conspire are enough to nudge their § 1 claim across the line from conceivable to plausible.  *Twombly*, 550 U.S. at 570.  Specifically, plaintiffs rely upon ¶ 100, which alleges that "an Executive Vice-President of Marketing & Distribution for Northwest Airlines, a Senior Vice President of Planning for US Air, and a Senior Vice

President of Marketing for American met for three hours in a Dallas hotel conference room"; and upon ¶ 102 as well, which avers that "in 2001, a Delta senior executive met for a weekend of golf and socializing at the home of an American executive responsible for setting American's commission levels. Four months later, American led an industry-wide reduction on commission caps from $20 to $10 . . . ."

However, plaintiffs' Amended Complaint does not cite any specific meetings that involved both Continental and American, the only two remaining defendants. The fact that American and Continental gathered at industry trade association meetings during the seven-year period when defendants reduced commission rates should not weigh heavily in favor of suspecting collusion. The Supreme Court rejected a similar argument in *Twombly:*

> From the allegation that [defendants] belong to various trade associations, . . . the dissent playfully suggests that they conspired to restrain trade, an inference said to be buttressed by the common sense of Adam Smith. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

*Twombly*, 550 U.S. at 567 n.12 (internal citation omitted). Moreover, a mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because American's and Continental's presence at such trade meetings is more likely explained by their lawful, free-market behavior. *Iqbal*, 129 S. Ct. at 1950.

Finally, plaintiffs argue that we should rely upon a statement made in 1983 by a former American Airlines executive who "approved commission cuts that are the subject of this action." Plaintiffs allege that this unnamed American executive encouraged an executive of a competitor airline (also unnamed) to increase its fares by 20% to "make more money."

Plaintiffs presumably refer to a statement made by Robert Crandall, former President of American, to Howard Putnam, former President of the now-defunct Braniff

airlines. *See United States v. Am. Airlines*, 743 F.2d 1114, 1116 (5th Cir. 1984). First, we note that Crandall made this statement more than twenty-five years ago. Second, the Amended Complaint avers only that Crandall "approved commission cuts" and fails to allege that he was actually involved in the conspiracy at issue here. In addition, we note that Crandall retired from American in 1998, placing his departure as CEO at the very beginning of plaintiffs' conspiratorial time line.

We conclude that Crandall's prior statement is too remote in time to support a plausible inference of agreement. We also do not view his statement as tending to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement between Continental and American. *See Twombly*, 550 U.S. at 555-56.

IV.

For these reasons, we affirm the judgment of the district court.

—————————————

**DISSENT**

—————————————

MERRITT, Circuit Judge, dissenting. In the recent *Twombly* and *Iqbal* cases, quoted and discussed at length by my colleagues in their majority opinion, the Supreme Court has started to modify somewhat, but not drastically, the notice pleading rules that have reigned under *Conley v. Gibson*, 355 U.S. 41, 45 (1957) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). These two cases now require more than simple notice and conclusory statements of ultimate facts about the case. Instead plaintiffs must plead "sufficient factual matter" to state a legal claim or cause of action that is not only "conceivable" but also "plausible," independently of the notice given and the legal conclusions stated — in short, a set of "well-pleaded factual allegations" that make the cause of action "plausible." *Iqbal*, 129 S. Ct. at 1949-51 (2009). The Supreme Court majority has made clear that it is not making a major change in the law of pleading with *Twombly* and its progeny.[1]

As with any other new, general legal standard, the nature and meaning of the newly modified standard can be understood and followed only by analyzing how the standard is applied in actual cases like this case. Here my colleagues have seriously misapplied the new standard by requiring not simple "plausibility," but by requiring the plaintiff to present at the pleading stage a strong probability of winning the case and excluding any possibility that the defendants acted independently and not in unison. My colleagues are requiring the plaintiff to offer detailed facts that if true would create a clear and convincing case of antitrust liability at trial without allowing the plaintiff the normal right to conduct discovery and have the jury draw reasonable inferences of liability from strong direct and circumstantial evidence.

—————————————

[1]The Court has been careful to point out that *Twombly* should not be read to impose a "probability requirement," or a "'heightened' pleading standard." *Twombly*, 550 U.S. at 556, 595 n. 14. The Court commented that an otherwise "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Id.* at 556 (internal quotations omitted).

**I.**

*Twombly* itself was a telephone antitrust case in which the only non-conclusory factual allegations in the complaint of a "contract, combination or conspiracy in restraint of trade" was that the former Baby Bell telephone companies continued to do business in their former home territories and did not "attack" and try to take market share away from the other operating Baby Bell companies in their home region.  This was the full extent of the *Twombly* factual allegations of anti-competitive behavior.  There was no allegation of action, as opposed to nonaction, misfeasance as opposed to nonfeasance.  The Supreme Court sensibly pointed out that there could be many explanations for this similar economic nonaction other than the kind of agreement not to compete required for liability under § 1 of the Sherman Act.  Thus the Supreme Court held that this one specific factual allegation of similar conduct was insufficient alone to state a "plausible" claim, though the Court seems to say that this kind of factual statement alone makes the pleading issue "close."  *Twombly*, 550 U.S. at 557 ("allegation of parallel conduct . . . gets the complaint close to stating a claim").

If the *Twombly* pleading issue was "close," but insufficient, based only on similar, stand-pat nonfeasance toward each other's historical territory, the allegations concerning the in unison, affirmative behavior of the airlines in this case are obviously sufficient.  The factual allegations in this case create an overwhelming case for the plaintiff to get by a motion to dismiss on the pleading.

Five times the airlines acted affirmatively, aggressively and publicly in unison to cut, fix and hold the price the airlines would pay the travel agents.  Although at present there is no written contract to that effect, the facts alleged present so plain a case that they might as well have put the plan in writing.

1.  The complaint alleges that United and American tried in 1981 and 1983, respectively, to fix the price lower to the travel agents but the other airlines would not go along.  The allegations recite the statements of an American Airlines executive that the airlines learned not to try again until everyone was on board.  The complaint alleges inside information tantamount to a partial confession.

2. Then when they tried again in 1995 the plan went like clock-work. Everyone followed the leader five straight times until the price reached zero. The allegations of fact, based on testimony of insiders, was that the plan could not work without agreement but could work if the airlines acted in unison. Since the plan worked like a charm, the allegations raise a strong inference of agreement. Not as strong as allegations raising an inference that "the sun will rise in the morning" based on history, but strong enough to be more than "plausible."

3. The airline executives in charge must not only have had hundreds of telephone conversations with each other and through intermediaries, but the specific, time-and-place factual allegations are that they met frequently over the period the airlines were acting in unison and according to plan. To suggest that they did not ever in all the meetings and personal contacts discuss their union of interests and how the cuts were working defies belief. The father of laissez faire economic theory, the liberal Scottish moral philosopher, Adam Smith, made the same basic point even more forcefully in *The Wealth of Nations* (1776), 230 years ago: "People of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public." Book 1, Chap. 10, part 1, 148 (New York: Modern Library, 2000). If the factual allegations of meetings are true — a matter not yet determined by an impartial fact finder — the case of liability is certainly strong enough to go to the jury.

4. The airlines, and specifically American Airlines' CEO Robert Crandall, attempted this type of coordinated scheme in the past. In 1984, Crandall was implicated in a price-fixing conspiracy because of comments he made to a competing airline president. In a recorded telephone conversation, the president of the competing airline asked Crandall how both airlines could continue to enjoy a monopoly over service to Dallas-Fort Worth International Airport, and Crandall instructed his competitor to raise its price and American would follow suit the very next day with a price increase of its own. *U.S. v. American Airlines, Inc.*, 743 F.2d 1114, 1116 (5th Cir. 1984). Having proposed to fall in line behind one another before strongly suggests that the airlines would do it again. In fact, when Delta announced a cap on travel agent commission in 1995, Crandall was responsible for setting American Airline's travel agent

commissions. Appellants' Reply Brief at 18. Unsurprisingly, American followed Delta's lead the very next day. *Id*.

To summarize, the complaint alleges that price cuts could not be made absent unilateral, follow-the-leader action by all of the defendants. It provides specific times and locations of numerous meetings attended by the defendants. Finally, and most importantly, the complaint ties the dates of those meetings with industry-wide simultaneous rate cuts that followed immediately thereafter. Reading these allegations as a whole, the complaint clearly satisfies the *Twombly* standard. In fact, the Supreme Court in *Twombly* noted that multiple competitors making "complex and historically unprecedented changes in pricing structure . . . for no other discernible reason" would properly state a claim under § 1 of the Sherman Act. 550 U.S. at 557 n. 4. That appears to be exactly the situation here.

## II.

The antitrust cases decided in both courts of appeals and district courts since *Twombly and Iqbal* are few, and most of the cases decided by district courts have yet to reach the courts of appeals. *But see St. Clair v. Citizens Fin. Group*, No. 08-4870, 2009 WL 2186515 (3rd Cir. Jul. 23, 2009). That said, district court judges across the country have dismissed a large majority of Sherman Act claims on the pleadings misinterpreting the standards from *Twombly* and *Iqbal*, thereby slowly eviscerating antitrust enforcement under the Sherman Act. *See, e.g.*, *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, No. 08-md-1972 TSZ, 2009 WL 2581510 (W.D. Wash. Aug. 18, 2009)*; Bailey Lumber & Supply Co. v. Ga.-Pac.* Corp., No. 1:08CV1394LG-JMR, 2009 WL 2872307 (S.D. Miss. Aug. 10, 2009); *Burtch v. Milberg Factors, Inc.*, No. 07-556-JJF-LPS, 2009 WL 1529861 (D. Del. May 31, 2009).

The uniformity needed for the rule of law and equal justice to prevail is lacking. This irregularity may be attributed to the desire of some courts, like my colleagues here, to use the pleading rules to keep the market unregulated, while others refuse to use the pleading rules as a cover for knocking out antitrust claims. *Compare In re California Title Ins. Antitrust Litig*, 2009 WL 1458025 (N.D. Cal. May 21, 2009) (dismissing price-

fixing complaint against major title insurance agencies who jointly set rates in states where they belonged to statutorily authorized rate setting organizations and employed similar rates in other states) *with Standard Iron Works v. Arcelormittal*, No. 08-C-5214, 2009 WL 1657449 (N.D. Ill. 2009) (finding plausibility despite lack of direct evidence of collective action by looking at a series of industry meetings attended by steel executives that were followed by industry-wide production cuts).

### III.

The Sherman Act was enacted in 1890 at the height and in the heat of controversy during a former Gilded Age. It was enacted to deter price fixing, market allocation among producers, and monopolization at a time of extreme disparities in economic power and wealth brought on by an extreme version of laissez faire economic theory.[2] After a long, slow climb toward a more equal distribution of economic power over the past century, in part because of the enforcement of the Sherman Act, we have recently returned to the great disparities that formerly existed. The failure to regulate

---

[2]*See* 21 Cong. Rec. 2460 (1889) (This inequality "has grown within a single generation out of the concentration of capital into vast combinations to control production and trade and to break down competition.").

the marketplace through antitrust enforcement is probably related to the mind-set that has dramatically reversed the earlier trend toward equality.[3]

There are many, including my colleagues, whose preference for an unregulated laissez faire market place is so strong that they would eliminate market regulation through private antitrust enforcement. Using the new *Twombly* pleading rule, it is

---

[3] A picture of the recent reversal of the long trend toward equality is as follows:



**FIGURE 1**
The Top Decile Income Share, 1917-2007

Source: Table A1 and Table A3, col. P90-100.
Income is defined as market income (and excludes government transfers).
Top decile includes all families with annual income above $109,630 in 2007.

Forty years ago the average CEO made twenty times what the average worker did; now it is nearly 400 times. Thomas Piketty & Emmanuel Saez, Income Inequality in the United States: 1913-1998, 118 Q.J. Econ. 1 (2003), data updated through 2007 available at http://elsa.berkeley.edu/~saez/.

From the time of Herodotus in 500 B.C. to the present, historians and political philosophers have believed that a high level of inequality of economic and political power undermines the basis of constitutional democracy and stable government generally: "So the Athenians had increased in strength, which demonstrates that an equal voice in government has beneficial impact not merely in one way, but in every way." THE LANDMARK HERODOTUS: THE HISTORIES 400 (Robert B. Strassler ed. 2007). "The constitutional essential here is rather that below a certain level of material and social well-being, and of training and education, people simply cannot take part in society as citizens, much less equal citizens...it is what is required to give due weight to the idea of society as a fair system of cooperation between free and equal citizens...." JOHN RAWLS, POLITICAL LIBERALISM 166 (1993).

possible to do away with price fixing cases based on reasonable inferences from strong circumstantial evidence. As in this case, the proponents of this strategy propose to require either an express written agreement among competitors or a transcribed oral agreement to fix prices. Nothing less will do. Insider testimony, a strong motivation to collude, and aggressive, lock-step unanimity by competitors in pricing become insufficient to state a case. Over time, the antitrust laws fall further into desuetude as the legal system and the market place are manipulated to benefit economic power, cartels, and oligopolies capable of setting prices. This case is just one small step in that direction. But this direction is unlikely to be changed unless the Supreme Court steps in to make it clear that *Twombly* may not be used, as my colleagues propose, as a cover for repealing regulation of the marketplace through private antitrust enforcement.