*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ALTON T. TERRY,

        *Plaintiff-Appellant,*

    *v.*

TYSON FARMS, INC.,

        *Defendant-Appellee.*

No. 08-5577

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 08-00003—Harry S. Mattice, Jr., District Judge.

Argued: March 4, 2009

Decided and Filed: May 10, 2010

Before: NORRIS, COOK, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Cynthia Noles Johnson, JOHNSON LAW, P.C., Cohutta, Georgia, for Appellant. Jay T. Jorgensen, SIDLEY AUSTIN LLP, Washington, D.C., for Appellee. Jonathan H. Levy, UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC, for Amicus Curiae. **ON BRIEF:** Cynthia Noles Johnson, JOHNSON LAW, P.C., Cohutta, Georgia, Russell D. Hedges, MOORE & HEDGES, Tullahoma, Tennessee, for Appellant. Jay T. Jorgensen, Carter G. Phillips, SIDLEY AUSTIN LLP, Washington, D.C., Travis R. McDonough, Roger W. Dickson, Zachary H. Greene, MILLER & MARTIN PLLC, Chattanooga, Tennessee, for Appellee. Jonathan H. Levy, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, DC, for Amicus Curiae.

_____

## OPINION

_____

GRIFFIN, Circuit Judge. Plaintiff Alton T. Terry, a Tennessee poultry farmer, entered into a contract with defendant Tyson Farms, Inc., the nation's largest poultry processing firm, to raise chickens. The present action evolved from purportedly unlawful

retaliatory actions taken by Tyson against Terry in response to his affiliation with, and leadership role in, a newly organized regional growers' association. Terry brought suit under the Agricultural Fair Practices Act of 1967 ("AFPA"), 7 U.S.C. § 2303, alleging unlawful interference and discrimination based on his membership in the growers' association; and the Packers and Stockyards Act ("PSA"), 7 U.S.C. §§ 192(a) and (b), alleging that Tyson engaged in unfair, discriminatory or deceptive practices, and subjected him to undue or unreasonable prejudice or disadvantage.

Tyson moved to dismiss Terry's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion as to both claims and entered judgment in favor of Tyson. In doing so, the court determined that Terry failed to allege his involvement with an "association of producers," as defined and required by the AFPA, 7 U.S.C. § 2302(c) (2008). The district court also awarded Tyson attorney's fees incurred in defending against Terry's AFPA claim, pursuant to 7 U.S.C. § 2305(a). With respect to Terry's PSA claim, the district court held that proof of injury to competition is a necessary element of a claim under 7 U.S.C. §§ 192(a) and (b) and, because Terry failed to plead that Tyson's actions had an adverse effect on competition, this count likewise must be dismissed for failure to state a claim.

Terry now appeals the dismissal of his complaint and the district court's award of attorney's fees to Tyson. For the following reasons, we affirm.

I.

In our de novo review of the district court's grant of Tyson's motion to dismiss under Rule 12(b)(6), we construe Terry's complaint in the light most favorable to him and accept his well-pled factual allegations as true. *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

In 2001, Terry bought a poultry farm in Tennessee and entered into an agreement with Tyson, which contracts with independent growers to raise broiler chickens owned and provided by the company. Tyson provides the chicks, feed, and technical advice; the responsibility of the grower is to raise the chickens to a target processing weight and then return the mature birds to Tyson. Tyson pays its growers according to a formula that

measures the relative productivity of the growers by comparing the amount of feed provided and the weight of the chickens upon their return to the processing plant. Consequently, the weight of the chickens at the end of the grow-out period is an important factor in the compensation equation, and federal regulations provide that weighing is to occur immediately upon arrival at the processor's plant. *See* 9 C.F.R. § 201.82(b).[1] A grower is entitled to watch his birds being weighed. *See* 9 C.F.R. § 201.108-1(e)(4).[2] Tyson's alleged failure to promptly weigh Terry's chickens and allow Terry access to the weighing of his birds began the chain of events that culminated in this lawsuit.

Before he purchased the farm, Terry researched the poultry business, reviewed the seller's production records, and spoke with Tyson's production manager at its Shelbyville, Tennessee, complex about Tyson's intent to continue its placement of chickens at the farm following the sale. The production manager assured Terry that the farm and equipment were in excellent condition and that it was a top-producing farm. These assurances lead Terry to believe that the farm would need no substantial improvements in the near future. In the summer of 2001, Terry and his family moved to the farm, and he took over management of the poultry flock.

Terry thereafter became aware of numerous problems that poultry growers were experiencing with Tyson and other poultry processors. In 2002, Terry attended a conference in North Carolina with other contract growers, attorneys representing growers, and representatives of farmers' organizations. The purpose of the conference was to address the problems faced by growers in their dealings with processors and to provide guidelines for the organization of grower associations. After the conference, Terry became actively involved in organizing the poultry growers in his area into what ultimately became the Tennessee Poultry Growers Association ("TPGA"). In 2004, he

---

[1] 9 C.F.R. § 201.82(b) provides: "Whenever live poultry is obtained under a poultry growing arrangement, the poultry shall be transported promptly after loading and the gross weight for grower payment purposes shall be determined immediately upon arrival at the processing plant, holding yard, or other scale normally used for such purpose."

[2] 9 C.F.R. § 201.108-1(e)(4) states in pertinent part: "Poultry growers . . . are entitled to observe the balancing, weighing, and recording procedures. A weigher shall not deny such persons that right or withhold from them any information pertaining to the weight."

was elected chairman of the directors for the TPGA.  In his capacity as a TPGA officer, Terry educated poultry growers about their rights under federal law and reported complaints about Tyson to officials at the Packers and Stockyards Administration in Washington, D.C.

Meanwhile, Terry became concerned that his poultry was not being weighed promptly upon arrival at the Tyson plant, as required by his contract and federal regulations.  In August and December of 2004, he went to Tyson's plant to watch his birds being weighed, but he was denied access.  He complained to a federal official and requested that a letter be sent to Tyson.  On February 13, 2005, Terry followed a truck loaded with his poultry to Tyson's processing plant.  When he arrived at the plant at 2:00 a.m., he was told that his chickens would not be weighed until after 4:00 a.m.  When Terry returned at 4:00 a.m., he was once again denied access to the plant.  Plaintiff called an agent with the Grain Inspection Division of the Packers and Stockyards Administration, who told Terry that he was in route to the plant and would find out why Terry was not allowed to observe the weighing of his poultry.

Later that same week, Terry met with Tyson's local managers.  Following the meeting, Tyson delayed its placement of birds on Terry's farm for a full flock rotation, costing Terry $30,000 in lost compensation.  When Terry met with Tyson's managers again on March 28, 2005, they informed him that Tyson made a "company decision" to discontinue the placement of birds at his farm after he made the weighing complaint.  Terry asked for, but was refused, compensation for the damages he sustained as a result of the missed flock.

On January 11, 2006, Tyson notified Terry that his contract would not be renewed, allegedly because of his confrontational behavior toward Tyson's representatives and his failure to make "costly and unnecessary" changes to his poultry operation, despite the fact that Terry was a successful poultry producer and was "well above average" in the grower rankings.  Terry avers that "[t]he reasons provided by Tyson for termination of [his] contract were false and pretextual to disguise Tyson's real reason, which was to thwart [his] efforts to organize growers, and in retaliation for [his]

complaints to the Packers [and] Stockyards Administration." Terry subsequently advertised his farm for sale, but claims that he has been unable to sell it due to Tyson's demands for costly upgrades as a condition to the continued placement of poultry at the farm. This lawsuit followed.

## II.

"[T]o survive a motion to dismiss, the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 903 (6th Cir. 2009) (citation omitted). "We need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Id.* (citations and internal quotation marks omitted). "[T]he complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level,' and 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

The parties to this appeal do not dispute the factual specificity of Terry's allegations. Rather, at issue is whether Terry's complaint contains adequate "direct or inferential allegations respecting all material elements to sustain a recovery" under the AFPA and PSA. *Tam Travel, Inc.*, 583 F.3d at 903. With regard to the latter statute, however, we must first settle the question whether a showing of injury to competition is a necessary element of a claim under the PSA.

## III.

This case poses a matter of first impression in this circuit: whether a plaintiff asserting unfair discriminatory practices or undue preference under §§ 202(a) and (b) of the PSA must allege an adverse effect on competition in order to state a claim. This issue is not novel to other courts; it has been addressed by seven of our sister circuits, with consonant results. All of these courts of appeals unanimously agree that an anticompetitive effect is necessary for an actionable claim under subsections (a) and (b). For the reasons that follow, we join this legion.

Section 202 of the PSA, codified at 7 U.S.C. § 192, provides:

It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

>   (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

>   (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or

>   (c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or

>   (d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

>   (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

>   (f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or

>   (g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.

7 U.S.C. § 192 (hereinafter "§ 192").

Terry alleges in Count Two of his complaint that "[d]efendant violated the [PSA] by engaging in unfair, unjustly discriminatory, or deceptive practices or devises [sic] in violation of § 202 of the [PSA], 7 U.S.C. § 192(a); and by subjecting Plaintiff to undue or unreasonable prejudice or disadvantage in violation of 7 U.S.C. § 192(b)." However, Tyson argued, and the district court agreed, that because the PSA is essentially an antitrust statute, subsections (a) and (b) require a party to allege an adverse effect on competition in order to sustain a cause of action. The district court dismissed Terry's PSA claim for failure to allege such anticompetitive activity on Tyson's part. In reaching this conclusion, the court noted the dearth of Sixth Circuit precedent on this issue and followed the prevailing tide of other circuit court decisions that have held that subsections (a) and (b) of § 192 require an anticompetitive effect.

The tide has now become a tidal wave, with the recent issuance of the Fifth Circuit Court of Appeals' en banc decision in *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355 (5th Cir. 2009) (en banc), in which that court joined the ranks of all other federal appellate courts that have addressed this precise issue when it held that "the purpose of the Packers and Stockyards Act of 1921 is to protect competition and, therefore, only those practices that will likely affect competition adversely violate the Act." *Wheeler*, 591 F.3d at 357. All told, seven circuits – the Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits – have now weighed in on this issue, with unanimous results. *See Wheeler*, 591 F.3d 355; *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1230 (10th Cir. 2007); *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1280 (11th Cir. 2005), *cert. denied*, 547 U.S. 1040 (2006); *London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1303 (11th Cir. 2005), *cert. denied*, 546 U.S. 1034 (2005); *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999); *Philson v. Goldsboro Milling Co.*, Nos. 96-2542, 96-2631, 164 F.3d 625, 1998 WL 709324, at *4-5 (4th Cir. Oct. 5, 1998) (unpublished table decision); *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995); *Farrow v. United States Dep't of Agric.*, 760 F.2d 211, 215 (8th Cir. 1985); *DeJong Packing Co. v. United States Dep't of Agric.*, 618 F.2d 1329, 1336-37 (9th Cir.

1980), *cert. denied*, 449 U.S. 1061 (1980); and *Pac. Trading Co. v. Wilson & Co.*, 547 F.2d 367, 369-70 (7th Cir. 1976).

In this appeal, Terry, joined by amicus curiae United States Department of Agriculture ("USDA"), seeks to persuade us to adopt the decidedly minority view embraced by some district courts and vigorously articulated by Judge Garza, along with six of his colleagues, in his dissenting opinion in *Wheeler*. *See Wheeler*, 591 F.3d at 371 (Garza, J., dissenting). *See also Schumacher v. Tyson Fresh Meats, Inc.*, 434 F. Supp. 2d 748, 754 (D.S.D. 2006) (holding that "§ 192(a)[] does not prohibit only those unfair and deceptive practices which adversely affect competition"); *Kinkaid v. John Morrell & Co.*, 321 F. Supp. 2d 1090, 1102 (N.D. Iowa 2004) ("[T]his court finds that only a strained reading of the statute could require that practices that are 'unfair' or 'deceptive' within the meaning of § 192(a) must *also* be 'monopolistic' or 'anticompetitive' to be prohibited."); *Gerace v. Utica Veal Co., Inc.*, 580 F. Supp. 1465, 1469-70 (N.D.N.Y. 1984) (holding that it is unnecessary to allege restraint of trade or hindrance of competition under § 192(a)).

Ultimately, Terry and the USDA would have this court deviate from the course taken by the seven other circuits that have spoken on this issue, thus creating a conflict. We decline to do so. "[W]hile we recognize that we are not bound by the law of other Circuits, this court has also routinely looked to the majority position of other Circuits in resolving undecided issues of law. We also take note of the importance of maintaining harmony among the Circuits on issues of law." *Wong v. Partygaming Ltd.*, 589 F.3d 821, 827-28 (6th Cir. 2009) (citations omitted); *see also United States v. Washington*, 584 F.3d 693, 698 (6th Cir. 2009) ("[T]his court routinely looks to our sister circuits for guidance when we encounter a legal question that we have not previously passed upon."). As one court has explained, this is more than a courtesy:

> As a general matter, we do not create conflicts among the circuits without strong cause. We adhere to this view because federal law (unlike state law) is supposed to be unitary. It would, of course, be foolhardy to suggest that we should blindly adhere to another circuit court's decision as a fail-safe method of preventing intercircuit conflict. Congress has created multiple and co-equal intermediate federal appellate courts, each

with an equal power and duty to decide the cases properly brought before it. This regime, by design, embraces the possibility of a considered difference in views among the circuit courts on a given question; a policy of blind adherence to the decision of another circuit, apart from any utility it might have in promoting uniformity and predictability in outcome, would flout the manifest will of Congress. As then-Judge Ginsburg had occasion to observe in *In re Korean Air Lines Disaster*, "each [federal court] has an obligation to engage independently in reasoned analysis." 829 F.2d 1171, 1176 (D.C. Cir. 1987), *aff'd*, 490 U.S. 122 [] (1989). At the same time, the interest that all prospective parties before the court have in uniformity and predictability of outcome must be given its due. We thus temper the independence of the analysis in which we engage by according great weight to the decisions of other circuits on the same question.

*Washington Energy Co. v. United States*, 94 F.3d 1557, 1561 (Fed. Cir. 1996).[3] Indeed, the *Wheeler* court was sensitive to the vast body of cohesive precedent when it pointed out that "[p]redictability must be the lodestar." *Wheeler*, 591 F.3d at 363.

As the next in line to interpret § 192's requirements, we, too, assign great weight to the unanimity of thought that precedes our own determination of this issue. Needless to say, "[w]e are not merely to count noses." *United States v. Hill*, 48 F.3d 228, 232 (7th Cir. 1995).[4] However, the rationale employed by our sister circuits is well-reasoned and grounded on sound principles of statutory construction. Moreover, under the fundamental principle of stare decisis, we deem the construction of this nearly 90-year-

---

[3]*See also Admiral Fin. Corp. v. United States*, 378 F.3d 1336, 1340 (Fed. Cir. 2004) ("[W]e accord great weight to the decisions of our sister circuits when the same or similar issues come before us, and we do not create conflicts among the circuits without strong cause.") (internal quotation marks omitted); *Am. Vantage Cos., Inc. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002) ("[A]lthough we are by no means compelled to follow the decisions of other circuits, there is virtue in uniformity of federal law as construed by the federal circuits.") (citation and internal quotation marks omitted); *United States v. Auginash*, 266 F.3d 781, 784 (8th Cir. 2001) ("Although we are not bound by another circuit's decision, we adhere to the policy that a sister circuit's reasoned decision deserves great weight and precedential value. As an appellate court, we strive to maintain uniformity in the law among the circuits, wherever reasoned analysis will allow, thus avoiding unnecessary burdens on the Supreme Court docket.") (internal quotations marks omitted); *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("We do not create conflicts among the circuits without strong cause."); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 925 F.2d 576, 580 (2d Cir. 1991) ("Where there is the considerable weight of unanimous authority, we believe that creation of such a circuit conflict must be based on an abiding conviction that the view of several other courts is unreasonable, lest the Supreme Court's ability to resolve conflicts among the circuits be impaired by the sheer number of such conflicts.").

[4]"[W]e are not constrained to follow [the views of our sister circuits] if, in our opinion, they are based upon an incomplete or incorrect analysis." *Nixon v. Kent County*, 76 F.3d 1381, 1388 (6th Cir. 1996) (citation omitted).

old statute to be a matter of settled law. We therefore join these circuits and hold that in order to succeed on a claim under §§ 192(a) and (b) of the PSA, a plaintiff must show an adverse effect on competition.

In the present case, the district court properly determined that although Terry asserts a number of wrongful acts by Tyson, his complaint does not allege that Tyson's actions had an anticompetitive effect: "Plaintiff focuses solely on how Defendant's action harmed him as an individual grower. He makes no allegations regarding the effect of Defendant's actions on the pricing of poultry or on overall competition in the poultry industry." Accordingly, the district court did not err in granting Tyson's motion to dismiss Terry's PSA claim.

IV.

Congress enacted the AFPA in 1968 to "protect[] the right of farmers and other producers of agricultural commodities to join cooperative associations through which to market their products," and "to rectify a perceived imbalance in bargaining position between producers and processors of such products." *Mich. Canners and Freezers Ass'n, Inc. v. Agric. Mktg. and Bargaining Bd.*, 467 U.S. 461, 464 (1984) (footnotes omitted). "[T]he Act's principal purpose is to protect individual producers from interference by processors when deciding whether to belong to a producers' association . . . ." *Id.*; *see also Newark Gardens, Inc. v. Mich. Potato Indus. Comm'n*, 847 F.2d 1201, 1203 (6th Cir. 1988); 7 U.S.C. § 2301 ("Because agricultural products are produced by numerous individual farmers, the marketing and bargaining position of individual farmers will be adversely affected unless they are free to join together voluntarily in cooperative organizations as authorized by law."). Consistent with these aims, the AFPA proscribes certain actions by processors, known as "handlers" under the Act:

> It shall be unlawful for any handler knowingly to engage or permit any employee or agent to engage in the following practices:
>
> > (a) To coerce any producer in the exercise of his right to join and belong to or to refrain from joining or belonging

> to an association of producers, or to refuse to deal with any producer because of the exercise of his right to join and belong to such an association; or
>
> (b) To discriminate against any producer with respect to price, quantity, quality, or other terms of purchase, acquisition, or other handling of agricultural products because of his membership in or contract with an association of producers[.]

7 U.S.C. §§ 2303(a) and (b).

In Count One of his complaint, Terry alleges that Tyson violated § 2303 by "knowingly permitting its employee or agent to coerce and intimidate Plaintiff in the exercise of his right to join and belong to an association of producers and by discriminating against Plaintiff with respect to the quantity and quality of poultry and feed supplied to Plaintiff because of his membership in an association of producers."

The parties do not dispute that Tyson is a "handler" and Terry is a "producer," as defined by the AFPA. *See* 7 U.S.C. §§ 2302(3)(A) and(4) (defining these respective terms). Rather, the dispositive issue is whether the association with which Terry was affiliated – the TPGA – satisfies the AFPA's definition of an "association of producers," so as to bring his allegations of coercion and discrimination under the protective umbrella of the statute. During the time period relevant to this cause of action, the AFPA defined an "association of producers" as "any association of producers of agricultural products *engaged in marketing, bargaining, shipping, or processing as defined in section 1141j(a) of Title 12, or in section 291 of this title*." 7 U.S.C. § 2302(c) (emphasis added).[5]

---

[5] The recently enacted Food, Conservation, and Energy Act of 2008 expanded the definition of "association of producers" to include "an organization whose membership is exclusively limited to agricultural producers and dedicated to promoting the common interest and general welfare of producers of agricultural products." 7 U.S.C. § 2302(2)(B). *See* Pub. L. 110-234, § 11003(6)(B), and Pub. L. 110-246, § 11003(6)(B) (redesignating former subsection (c) of § 2302 as paragraph 2 and added subparagraphs (A) and (B)). The issue of retroactive application of this amendment, effective May 22, 2008, has not been raised by Terry on appeal and hence is forfeited. *See generally United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006) ("[A]n appellant abandons all issues not raised and argued in its initial brief on appeal.") (citation and quotation marks omitted); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 544 n.8 (6th Cir. 2002) ("It is well established that an issue not raised in a party's briefs on appeal may be deemed waived.").

Section 2302(c) of the AFPA cross-references two other statutes, the Agricultural Marketing Act of 1929 ("AMA") and the Capper-Volstead Act, which define similar farming associations. The AMA was enacted to promote the efficient production and distribution of agricultural commodities, in part, by permitting producers to organize "cooperative associations" to assist in bringing products to market. 12 U.S.C. § 1141(a)(3); *see Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1042 (2d Cir. 1980) (observing that the declared policy of the AMA is "to promote the effective merchandising of agricultural commodities" through "a farm marketing system of producer-owned and producer-controlled cooperative associations."). The AMA defines the term "cooperative association" as

> any association in which farmers act together in processing, preparing for market, handling, and/or marketing the farm products of persons so engaged, and also means any association in which farmers act together in purchasing, testing, grading, processing, distributing, and/or furnishing farm supplies and/or farm business services . . . .

12 U.S.C. § 1141j(a).

The Capper-Volstead Act "removed from the proscription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market." *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822 (1978) (footnote omitted). It was passed by Congress in 1922 "to make it clear that the formation of an agricultural organization with capital would not result in a violation of the antitrust laws, and that the organization, without antitrust consequences, could perform certain functions in preparing produce for market." *Id.* at 824; *see also Newark Gardens, Inc.*, 847 F.2d at 1208 (noting that the Capper-Volstead Act "exempts agricultural cooperatives from the antitrust laws"). The Capper-Volstead Act includes within its scope agricultural producers who "act together in associations . . . in collectively processing, preparing for market, handling, and marketing [farm products] in interstate and foreign commerce." 7 U.S.C. § 291. "The real sense behind such an association and the prime purpose of the persons so banding together is to accomplish a common objective – collective marketing. It is a collection

of producers cooperating to sell the goods they have produced."  *United States v. Elm Springs Farm, Inc.*, 38 F. Supp. 508, 511 (D. Mass. 1941); *see also Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1185 (8th Cir. 1982) ("The unmistakable purpose of the Capper-Volstead Act is to permit farmers and only farmers to band together and benefit economically from collective marketing of their products.").

In its motion to dismiss, Tyson argued that the TPGA does not qualify as an AFPA "association of producers" because Terry does not allege that the TPGA engaged in the requisite "marketing, bargaining, shipping, or processing" activities enumerated in § 2302(c); instead, Terry's complaint avers only that the TPGA gathered information, educated its members, and reported complaints about Tyson and other processors to the government – functions purportedly outside of the purview of the AFPA.

The district court examined Terry's complaint and, relying on the plain language of § 2302(c), agreed with Tyson that the TPGA does not fall within the statutory definition of an "association of producers":

> Interpreting § 2302(c), the United States Court of Appeals for the Sixth Circuit has held that a state-run potato commission was not an "association of producers" because it did not engage in marketing, bargaining, shipping or processing of agricultural products.  *Newark Gardens, Inc. v. Mich. Potato Indus. Comm'n*, 847 F.2d 1201, 1206 (6th Cir. 1988).
>
> In his capacity as president of the TPGA, Plaintiff "gathered information from other growers about problems they were having with Tyson" and reported these complaints to government agencies.  (Complaint, Court Doc. 1, ¶ 13.).  Plaintiff also "educated other growers about federal laws prohibiting abuse of growers in the poultry industry."  (*Id*. at ¶ 14.).  Plaintiff distributed video tapes to other growers that reported on problems in the poultry industry.  (*Id*. at ¶ 15.).  From the allegations in Plaintiff's complaint, it appears that TPGA is principally involved with educating growers about their rights and assisting growers with enforcing their rights by reporting producers' violations to federal agencies.
>
> Defendant argues that TPGA's "educational and informational efforts and, to the extent that they exist, its government complaints, do not qualify it as an 'association of producers'" under the AFPA. (Court Doc. 11 at 7.).  The statutory language is clear that an "association of producers" includes only those organizations that engage in "marketing,

bargaining, shipping or processing" of agricultural products.  7 U.S.C. § 2302(c).  The Court must therefore evaluate whether the TPGA is involved with any of the specified activities.

"Marketing" is "the act of buying and selling in a market; the commercial functions involved in transferring goods from producer to consumer." *The American Heritage Dictionary of the English Language* 1072 (4th ed. 2000).  No reasonable inference can be drawn from the allegations in the complaint that the TPGA engages in buying or selling of goods in a market or in the commercial functions involved with transferring goods from producer to consumer.  The actions of the TPGA do not, therefore, qualify as marketing under § 2302.

"Shipping" is "the act or business of transporting goods."  *Id*. at 1607.  "Producing" is "to bring forth, yield; to manufacture; to cause to occur or exist; to make or yield products or a product."  *Id*. at 1399.  No reasonable inference can be drawn from the complaint that the TPGA is involved with shipping or producing agricultural goods under § 2302.

"Bargaining" is "to negotiate the terms of an agreement, as to sell or exchange; to engage in collective bargaining; to arrive at an agreement." *Id*. at 144.  There is no allegation that TPGA negotiates on behalf of any of its members or, as discussed above, sells or exchanges agricultural goods.  "Collective bargaining" is "negotiation between organized workers and their employer or employers to determine wages, hours, rules, and working conditions."  *Id.* at 362.  Although it appears that Plaintiff, in his role as president of TPGA, discussed issues such as working conditions and federal laws with other growers, there is no allegation that he ever discussed those issues with Defendant. Moreover, the relationship between Plaintiff and Defendant is not that of employer/employee but of two commercial organizations under contractual obligations to each other.  There is no indication from the allegations in the complaint that TPGA had any interaction with Defendant and could not, therefore, have collectively bargained with Defendant.  As such, there is no indication that TPGA engaged in "bargaining," collective or otherwise, with regard to agricultural products as required by § 2302.

The district court further determined that the TPGA's educational and enforcement activities did not otherwise fall within the cross-referenced definitions set forth in the AMA and Capper-Volstead Act, and observed that "[t]here is no apparent policy reason that the activities of the TPGA would be subject to antitrust laws and therefore no need to establish an exemption for such activities."  Therefore, because a

material element of Terry's AFPA claim was fatally lacking, the district court dismissed Terry's AFPA claim.  We affirm the district court's sound decision.

Terry argues that in granting Tyson's motion to dismiss, the district court employed a pleading standard that is too exacting under *Twombly*.  He contends that "[a] plausible reading of [his] [c]omplaint is that one of the purposes of [the TPGA] was to strengthen the marketing and bargaining position of the growers who were organizing to address common grievances and concerns in their relationship with Tyson" and, therefore, the TPGA qualifies as an "association of producers."  According to Terry, the district court's "narrow" construction of the AFPA is at odds with the remedial purpose of the statute, i.e., to prevent processors from using their superior bargaining position to the detriment of producers.  Terry maintains that Tyson has effectively chilled the ability of its contract growers to form an association for their mutual benefit and increase their bargaining power, thereby defying the protective goals of the AFPA.

However, Terry's interpretation of the AFPA disregards the plain language of the statute, *see Thompson v. N. Am. Stainless*, 567 F.3d 804, 807 (6th Cir. 2009) (en banc), and the germane maxim *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of others"), *Millsaps v. Thompson*, 259 F.3d 535, 546 (6th Cir. 2001), that "justif[ies] the inference that [activities] not mentioned were excluded by deliberate choice, not inadvertence . . . ." *City of Cleveland v. Ohio*, 508 F.3d 827, 847 (6th Cir. 2007) (citation and internal quotation marks omitted).  Terry's complaint does not allege that the TPGA engaged in any of the primary functions of an "association of producers" enumerated in the AFPA or related statutes.  Moreover, Terry's stance is contradictory to our prior decision in *Newark Gardens*.

In *Newark Gardens*, the plaintiff, a Michigan potato-farming business, brought suit against the Michigan Potato Industry Commission, alleging that certain provisions of a Michigan statute that required potato producers to pay a promotional assessment to the commission was in conflict with and, thus, preempted by the AFPA.  *Newark Gardens*, 847 F.2d at 1201.  The plaintiff argued that it was being coerced into joining or belonging to an "association of producers" in violation of § 2303(a) of the AFPA, or

maintaining a "*marketing* contract with an association of producers" in violation of § 2303(c). *Id.* at 1207. The express purpose of the Potato Commission was to "foster, develop, and promote the potato industry through research, promotion, advertising, market expansion, development of new markets, education, and the development and dissemination of market and industry information." *Id.* at 1202 (quoting MICH. COMP. LAWS § 290.423(1)). We rejected the plaintiff's "expansive interpretation of the definition of 'association of producers,'" namely, its argument that because the Potato Commission supplied "market information," it therefore engaged in "marketing" under the AFPA:

> The district court concluded that [the] definitional sections [of the AFPA, AMA and Capper-Volstead Act] described traditional cooperatives among farmers and did not contemplate governmental commodity promotion boards such as the Potato Commission . . . . The district court found that the Potato Commission was not within "the cooperative association tradition" because it did not engage in collective bargaining on behalf of farmers, nor did it perform any act which involved the sale or transfer of title in potatoes from grower to shipper to retailer to consumer. Therefore, since the Commission did not fit within the definitions contained in 7 U.S.C. § 291 or 12 U.S.C. § 1141j(a), the court reasoned that it was not an "association of producers" within the meaning of the AFPA as defined in 7 U.S.C. § 2302(c). We agree.

*Id.* at 1208.

We therefore affirmed the district court's grant of summary judgment to the defendant. *Id.* at 1210. In so holding, we distinguished *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir. 1974), in which the Ninth Circuit Court of Appeals held that two potato-growers' associations engaged in "marketing" within the meaning of the Capper-Volstead Act and therefore were immune from antitrust prosecution. The Ninth Circuit broadly construed the term "marketing" and concluded that even though the associations "did not collectively process, prepare for market, handle or actually sell potatoes,"[6] their activities nonetheless constituted marketing because each association "negotiat[ed] contracts for the sale of potatoes by

---

[6]These activities were carried out by the individual members.

its members," which "necessarily require[d] supplying market information and performing other acts that are part of the aggregate of functions involved in the transferring of title to the potatoes." *Treasure Valley*, 497 F.2d at 215.

In *Newark Gardens*, we concluded that "[t]he collective bargaining activities of the associations which represented the farmers in *Treasure Valley* are clearly distinguishable from the activities of the Potato Commission . . . . These bargaining associations which negotiated with the processors on behalf of the farmers were within the traditional definition of cooperative associations." *Newark Gardens*, 847 F.2d at 1209. By contrast, the Potato Commission "does not attempt to dictate the price, terms, or timing of the sale of potatoes in Michigan." *Id*. at 1206. "Potato producers are free to sell to whomever they choose at whatever price they negotiate." *Id*.[7]

As our decision in *Newark Gardens* makes clear, the term "association of producers" includes only those organizations that are directly involved with bringing farmers' products to market. The TPGA, according to Terry's well-pled allegations, simply does not fit this profile. Like the Potato Commission in *Newark Gardens*, the TPGA neither negotiates with poultry processors nor "perform[s] any act which involve[s] the sale or transfer of title in [poultry] from grower to shipper to retailer to consumer." *Id*. at 1208. Nothing in Terry's complaint suggests that the TPGA is primarily engaged in one or more of the AFPA's designated activities, i.e., "marketing, bargaining, shipping or processing" its members' agricultural products. 7 U.S.C. § 2302(c). *Cf. I.C.C. v. Jamestown Farmers Union Federated Coop. Transp. Ass'n*, 57 F. Supp. 749, 753 (D. Minn. 1944), *aff'd* 151 F.2d 403 (8th Cir. 1945) ("[I]f the

---

[7]This distinction drawn in *Newark Gardens* is equally applicable to other cases which have found that an association has engaged in "marketing" under the Capper-Volstead Act. *See, e.g., Fairdale Farms, Inc.*, 635 F.2d at 1040 (eschewing a "hyper-technical reading" of the Capper-Volstead Act in determining that cooperative associations organized for the sole purpose of fixing prices were engaged in marketing and therefore entitled to antitrust protection under the act); *Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 825 (N.D.N.Y. 1996) ("In the case at bar, the Complaint by its own terms states that defendants are in the business of 'testing milk and providing the "official" milk production records for dairy farmers.' As such, each defendant [association] clearly has demonstrated that it is performing a 'marketing' function within the meaning of the . . . Capper-Volstead Act[]."); *N. Cal. Supermarkets, Inc. v. Cent. Cal. Lettuce Producers Coop.*, 413 F. Supp. 984, 991-92 (N.D. Cal. 1976) (citing *Treasure Valley* and holding that activities of lettuce producers' cooperative association fell within protective scope of Capper-Volstead Act because, even though the cooperative did not grow, ship, sell, or negotiate the sale of products in its own name, it set prices, supplied market information, and performed other acts related to the transfer of title of the products).

cooperative is predominantly engaged in one or more of the activities specified in the [AMA], . . . such association does not lose its fundamental character as a cooperative" by engaging in other activities incidental to the primary statutory activity.). Rather, it is an organization principally involved with educating growers about their rights and assisting growers in the enforcement of those rights by reporting processors' violations to federal authorities. The fact that the TPGA's educational and policing activities may have the incidental benefit of increasing the growers' bargaining power, as Terry posits, does not bring it within the AFPA's definition of "association of producers," because, as *Newark Gardens* demonstrates, such an association must *itself* bargain or market on behalf of its members.

Terry has failed to allege that Tyson's unlawful actions stem from his involvement with an AFPA-protected "association of producers." Consequently, his complaint is deficient, in that it does not "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Tam Travel, Inc*., 583 F.3d at 903 (citation omitted). We therefore affirm the district court's dismissal of his AFPA claim pursuant to Rule 12(b)(6). *Cf. Leonhardt v. Western Sugar Co.*, 160 F.3d 631, 637 (10th Cir. 1998), *abrogated on other grounds by Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546 (2005) ("The prohibition on the making of 'false reports' [under § 2303(e) of the AFPA] . . . appl[ies] only to false reports about associations of producers or handlers which are intended to influence or that have the effect of influencing a producer's decision to join an association. Because plaintiffs' complaint made no allegation concerning membership in such an association, we affirm the district court's dismissal of plaintiffs' AFPA claim for failure to state a claim.").

## V.

Next, Terry appeals the district court's award of attorney's fees to Tyson for its legal costs incurred in defending against Terry's AFPA claim. The AFPA's fee-shifting provision states that "[i]n any action commenced pursuant hereto, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the

costs." 7 U.S.C. § 2305(a). Terry maintains that we should apply the standard set forth in *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412 (1978), in which the Supreme Court, in the context of a Title VII civil rights case, held that a prevailing defendant should be awarded attorney's fees only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation," so as not to discourage civil rights plaintiffs or "undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII." *Christiansburg Garment Co.*, 434 U.S. at 421-22. *See also Garner v. Cuyahoga County Juvenile Court*, 554 F.3d 624, 635-36 (6th Cir. 2009) (applying *Christiansburg* standard to a claim under 42 U.S.C. § 1988). Terry asserts that "[a]n award of fees to a prevailing defendant under a lesser standard than that established by *Christiansburg* would deter producers such as Terry from acting to enforce their rights under the AFPA, thus defeating the very purpose of the Act – to prevent processors from chilling producers from joining together with other growers."

However, Terry failed to raise this issue in a timely manner for the district court's consideration; hence, it is not properly preserved for our review. *See Foster v. Barilow*, 6 F.3d 405, 407-08 (6th Cir. 1993) (holding that issue regarding whether attorney's fees could be awarded to prevailing defendants in an action under the Fair Housing Act, without a determination that the claim was frivolous, groundless, or unreasonable, was forfeited on appeal because it was not raised in the district court); *see also Smoot v. United Transp. Union*, 246 F.3d 633, 648 (6th Cir. 2001) (declining to consider the plaintiff's appellate challenge to award of attorney's fees where the plaintiff failed to raise an objection in the district court); *Moore v. Int'l Bhd. of Elec. Workers, Local 58*, 60 F. App'x 581, 582 (6th Cir. 2003) (unpublished) (affirming district court's judgment in favor of defendants where the plaintiff "failed to timely respond to the defendants' motion for attorneys' fees in the district court, [and thus] waived any objection he had to the defendants' application for and the district court's award of attorneys' fees").

Moreover, there is no reason to deviate from the general forfeiture rule in this case. When faced with an identical unpreserved challenge to an award of attorney's fees

to the prevailing defendants in *Foster*, we declined to apply the "narrow" exceptions to the forfeiture rule because "the issue was not developed with sufficient clarity and completeness in the district court" and "a ruling in favor of the [plaintiffs] would require further litigation in the district court on the frivolousness issue," thereby prolonging the litigation. *Foster*, 6 F.3d at 407-08 (internal quotation marks omitted).

We decline to address Terry's argument under these similar circumstances, where a remand to the district court for further development of the record on the question of bad faith would be necessary.

Terry offers no other reasons why the district court abused its discretion in awarding attorney's fees to Tyson, as the prevailing party, under § 2305(a). In fact, our review of the record indicates that both the magistrate judge, to whom the matter was referred, and the district court thoroughly evaluated Tyson's counsel's billing records, required itemization of AFPA-related fees and a local attorney's affidavit attesting to the reasonableness of the charged hourly rate,[8] and then evaluated the requested fees using the accepted "lodestar" calculation method. S*ee generally B & G Mining, Inc. v. Dir., Office of Workers' Comp. Programs*, 522 F.3d 657, 661-63 (6th Cir. 2008); *Moore v. Freeman*, 355 F.3d 558, 565-66 (6th Cir. 2004); *Paschal v. Flagstar Bank, FSB*, 297 F.3d 431, 434-35 (6th Cir. 2002); and *Reed v. Rhodes*, 179 F.3d 453, 471-73 (6th Cir. 1999). We therefore will not disturb the award.

## VI.

For the reasons stated, we affirm the judgment of the district court.

---

[8]Tyson's proffered attorney's fees incurred in defending against both the AFPA and PSA claims totaled $57,455.00. Tyson asserted that $27,461.00, or 47.8% of the total, was for fees incurred in defending the AFPA claim. The district court adopted the magistrate judge's report and recommendation advising that Tyson should be awarded its requested amount of AFPA fees.