RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0265p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

SAAB AUTOMOBILE AB; SPYKER N.V.,

          *Plaintiffs-Appellants,*

    *v.*

GENERAL MOTORS COMPANY,

          *Defendant-Appellee.*

No. 13-1899

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:12-cv-13432—Gershwin A. Drain, District Judge.

Argued:  July 29, 2014

Decided and Filed:  October 24, 2014

Before:  SILER, BATCHELDER, and DONALD, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Benjamin Chew, PATTON BOGGS, LLP, Washington, D.C., for Appellants. Kathryn D. Kirmayer, CROWELL & MORING LLP, Washington, D.C., for Appellee. **ON BRIEF:**  Benjamin Chew, Andrew Zimmitti, Stephen A. Vaden, PATTON BOGGS, LLP, Washington, D.C., for Appellants.  Kathryn D. Kirmayer, CROWELL & MORING LLP, Washington, D.C., for Appellee.

─────────────────

**OPINION**

─────────────────

SILER, Circuit Judge.  Saab Automobile AB ("Saab") and its parent company, Spyker N.V. ("Spyker") (collectively "Plaintiffs"), sued General Motors Company ("GM") for tortious interference with economic expectancy under Michigan law, claiming that GM made public

statements that caused a transaction between Saab and a Chinese investor to fall through, thereby driving Saab into bankruptcy. The district court granted GM's motion to dismiss for failure to state a claim, finding that Plaintiffs failed as a matter of law to establish a valid business expectancy and intentional interference by GM. For the reasons stated below, we **AFFIRM**.

**I.**

In 2010, GM sold its wholly owned subsidiary Saab to Spyker, whereby Spyker acquired a majority interest in Saab, and GM retained a minority interest through preferred shares. As part of the sale, the parties entered into a series of agreements, including the Automotive Technology License Agreement (the "ATLA"). Pursuant to the ATLA, GM granted Saab a license to make and assemble certain Saab models using GM intellectual property. It prohibited Saab from assigning or otherwise transferring its rights under the ATLA without GM's prior written consent.[1] It also granted GM the power to terminate the ATLA "if SAAB initiate[d] a sale or transfer of all or substantially all of its assets . . . without the prior written consent of [GM]; . . . [or] if SAAB initiate[d] a direct or indirect Change of Control to an [Original Equipment Manufacturer ("OEM")] or OEM related entity without the prior written consent of [GM]."[2] Otherwise, the ATLA was set to expire in 2024.

In 2010 and 2011, Saab faced financial hardship, prompting it to seek financing deals to generate liquidity. In 2011, Saab attempted to enter into multiple investment arrangements with Zhejiang Youngman Lotus Automobile Co., Ltd. ("Youngman"), a large Chinese automobile manufacturer. However, when presented with the proposed deals, GM continually refused to approve any agreements that involved Chinese ownership or control of its licensed technology. In the meantime, Saab filed for voluntary reorganization under Swedish law. On December 7, 2011, Saab's reorganization administrator announced that it would apply for termination of Saab's voluntary reorganization because it appeared that Saab would be unable to obtain the

---

[1]This provision grants GM not only the right to consent, but to withhold consent and terminate the ATLA if Saab were to proceed without it. For ease of reference, we will refer to this provision as GM's "consent right" throughout the opinion.

[2]The ATLA defines an OEM as "an original equipment manufacturer which operates in the fields of manufacturing or assembling of vehicles or of supplying Parts directly or indirectly to the automotive industry."

necessary financing to continue the reorganization. A hearing before a Swedish court was set for Monday, December 19.

According to their complaint, Plaintiffs "determined that the only way to avoid imminent bankruptcy liquidation was to structure a deal in such a way that any outside ownership and control would be limited to Saab proprietary technology with no reliance upon the legacy GM technology licensed under the ATLA," and thus not require any consent or approval from GM. Therefore, Saab and Youngman negotiated the Framework Agreement and circulated an unexecuted copy on the afternoon of Friday, December 16. Under the agreement, Youngman would provide Saab a €200 million loan, including an immediate cash infusion of €10 million, which would be converted into an equity interest in Saab after Saab ceased using GM technology in its vehicles. Under the terms of the deal, Youngman would ultimately "hold[] no less than 70% of the shares and voting power in Saab."

The Framework Agreement outlined ten separate agreements and commitments that would need to be negotiated and entered into by Saab and Youngman in order to execute their proposed deal. The parties agreed to execute all of the agreements by December 19, the day of the bankruptcy hearing, or by closing, which was set for December 31. The agreement also required Saab and Youngman to procure regulatory approvals from multiple governing bodies as a pre-condition to closing.

According to Plaintiffs, Youngman was prepared to execute the Framework Agreement on the following day, Saturday, December 17. However, on that day, GM spokesperson James Cain made two statements regarding the proposed deal pursuant to its consent right under the ATLA. First, Cain issued a public statement that:

> Saab's various new alternative proposals are not meaningfully different from what was originally proposed to [GM] and rejected. Each proposal results either directly or indirectly in the transfer of control and/or ownership of the company in a manner that would be detrimental to GM and its shareholders. As such, GM cannot support any of these proposed alternatives.

Second, a Swedish daily newspaper published an interview with Cain, wherein the reporter asked why GM would not approve of the Framework Agreement, and Cain responded:

[i]t is wrong that Saab claims that they can do this deal without consulting us. We cannot continue to provide Saab with components . . . if this proposal remains. This proposal is similar to other proposals submitted in recent weeks.

Two days later, on the date of the scheduled bankruptcy hearing, Saab filed for bankruptcy liquidation. Youngman announced that it was unable to reach a deal with Plaintiffs "due to GM's position." Plaintiffs then filed this action in 2012 pursuant to diversity jurisdiction, alleging tortious interference with economic expectancy under Michigan law.

GM filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), which the district court granted and thereby dismissed the action. The court found that Plaintiffs failed to show they had a valid business expectancy in the Framework Agreement, first, because it required numerous other agreements to be negotiated or approved in one weekend's time, and Plaintiffs did not present any evidence that the agreements were even in the negotiation process; and, second, because the agreements "were subject to the approvals and contingencies of multiple companies and governments." The court then found that Plaintiffs failed to establish that GM intentionally interfered with their alleged economic expectancy because GM's actions were motivated by legitimate business reasons; because GM's statements were true and thus constitutionally protected; and because GM's motives were not malicious.

**II.**

This matter was filed pursuant to 28 U.S.C. § 1332. "[F]ederal courts sitting in diversity 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). When deciding issues of substantive law, we apply the law of the state's highest court. *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995). "If, however, the state's highest court has not decided the applicable law, then [we] must ascertain the state law from all relevant data," which includes the state's appellate court decisions. *Id.* (internal quotation marks and citation omitted).

**III.**

Plaintiffs argue that the district court erred in holding that they failed to establish a valid business expectancy in the Framework Agreement and in holding that they failed to establish that

GM intentionally interfered with their alleged economic expectancy. We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss, construing the complaint in the light most favorable to Plaintiffs, accepting their well-pleaded allegations as true, and drawing all reasonable inferences in their favor. *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 562 (6th Cir. 2013).

To prevail on a claim of tortious interference with economic expectancy under Michigan law, Plaintiffs must prove:

> (i) the existence of a valid business relationship or expectancy; (ii) knowledge of the relationship or expectancy on the part of the defendant; (iii) intentional interference causing or inducing a termination of the relationship or expectancy; and (iv) resultant actual damage.

*Lucas v. Monroe Cnty.*, 203 F.3d 964, 979 (6th Cir. 2000); *see also Cedroni Assocs., Inc. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc.*, 821 N.W.2d 1, 3 (Mich. 2012).

Plaintiffs failed to establish that GM intentionally interfered with their alleged economic expectancy. Plaintiffs argue that they established intentional interference by GM because GM exercised a consent right that it in fact did not have due to the structure of the Framework Agreement and, therefore, GM acted with the necessary wrongful intent in making its statements.

As a preliminary matter, GM appears to have correctly interpreted its contract right under the ATLA to mean that it had a right to consent or withhold its consent to the proposed deal between Saab and Youngman. Under Michigan law, "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 271 F.3d 235, 238 (6th Cir. 2001) (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)). To do so, we apply the plain language of the contract itself. *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 667 (Mich. Ct. App. 2000). The plain language of the ATLA unambiguously grants GM a consent right regarding the Framework Agreement. Under the ATLA, GM could terminate the ATLA if Saab "initiate[d]" a sale of all or substantially all of its assets or a direct or indirect change of control to an OEM or OEM-related entity without GM's prior written consent. The parties agree that "initiate" means "to begin." Because Saab would have begun a change of control to Youngman by executing the

Framework Agreement and its underlying substantive documents, GM had the contractual right to approve of the proposed deal.

Plaintiffs attempt to argue that, under the plain terms of the Framework Agreement, no change of control could begin until Saab no longer relied on GM-licensed technology. However, the plain language of the Framework Agreement is irrelevant—we are interpreting the ATLA contract between Plaintiffs and GM. Furthermore, the ATLA broadly provides for initiated sales or changes of control, does not require that the intended result of that transaction be immediate, and also explicitly provides for the situation of an indirect change of control, which covers a loan that eventually turns into a 70 percent equity interest.

Plaintiffs urge us to consider parol evidence pursuant to the law of Hong Kong or Sweden because, under the Framework Agreement's choice-of-law clause, these laws apply and require parol evidence to be considered, even when a contract is not ambiguous. Considering such extrinsic evidence, however, GM still had a consent right regarding the Framework Agreement. Plaintiffs argue that their complaint shows they intended to keep Saab out of liquidation while avoiding triggering GM's consent right. While it is true that Plaintiffs attempted to draft around the ATLA to secure a deal with Youngman, it is not the intent in drafting the Framework Agreement that matters, but the intent of GM and Plaintiffs in entering the ATLA. Plaintiffs have not produced any extrinsic evidence regarding GM's and Plaintiffs' motivation for entering the ATLA, and they certainly have not presented evidence that GM intended for Plaintiffs to be able to draft around GM's consent right.

Having established that GM had a right to consent to the Framework Agreement, we turn to whether GM intentionally interfered with Plaintiffs' alleged economic expectancy. Intentional interference "requires more than just purposeful or knowing behavior on the part of the defendant." *Wausau Underwriters Ins. Co. v. Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003). "[A] plaintiff must also allege that the interference was either (1) a *per se* wrongful act or (2) a lawful act done with malice and unjustified in law for the purpose of invading the . . . business relationship of another." *Id.* (internal quotation marks and citation omitted); *see also Feldman v. Green*, 360 N.W.2d 881, 891 (Mich. Ct. App. 1984).

First, GM's statements were not per se wrongful.  Under Michigan law, "[a] per se wrongful act is an act that is inherently wrongful or one that is never justified under any circumstances." *Stephenson v. Allstate Ins. Co.*, 141 F. Supp. 2d 784, 794 (E.D. Mich. 2001) (quoting *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289, 293 (Mich. Ct. App. 1988)).  "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Wausau Underwriters*, 323 F.3d at 404 (quoting *BPS Clinical Labs. v. Blue Cross and Blue Shield of Mich.*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996)).  In its public statement, GM openly cited its concern that the sale to Youngman would be detrimental to GM and its shareholders as the basis for not consenting to the Framework Agreement.  GM reiterates on appeal that it was concerned about who owned Saab while using GM technology and, more broadly, who would receive the benefit of Saab's use of GM's technology, brand, and goodwill.  Because GM was motivated by legitimate business concerns about the Framework Agreement, its statements do not constitute improper motive or interference.

Plaintiffs argue that the district court failed to consider requisite factors in determining if improper motive exists when a defendant relies on legitimate business reasons as a defense.  Under Michigan law, in addition to the defendant's motive, a court must consider "(1) the nature of the defendant's conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference." *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 463 (Mich. Ct. App. 1989).

Plaintiffs focus solely on the proximity factor and argue that "GM waited until two days before the crucial bankruptcy court hearing on Saab's reorganization plan before voicing its objections to the Framework Agreement," and that GM's delay was designed "to leave no time to challenge GM's faulty assertion [of a consent right], forcing Saab into liquidation and eliminating a potential competitor."  They attempt to obscure the timeline, when in reality GM's statements were made just one day after the Framework Agreement was circulated, so the lack of time between the statements and the bankruptcy hearing was a byproduct of Saab's last-ditch effort to avoid liquidation in two days' time.  Plaintiffs also omit the very important fact that GM

had continually refused to approve any of Saab's other proposed deals with Youngman, so to say GM "waited until the last minute to spook Saab's prospective business partner and contentedly watch[ed] as Saab went into liquidation" mischaracterizes the situation. Therefore, the proximity of GM's conduct to the interference with the Framework Agreement lends no more credence to Plaintiffs' argument, and the remaining factors likewise fail to enhance their claim.

Furthermore, where a defendant has a contractual right, the "exercise of that right cannot, as a matter of law, constitute a per se wrongful act." *Stephenson*, 141 F. Supp. 2d at 794. GM had a valid consent right under the ATLA as applied to the Framework Agreement, and as such, its statements regarding its exercise of that consent right cannot be actionable.

Second, GM's statements were not malicious. "To establish that a lawful act was done with malice and without justification, [a] plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *Power Tools & Supply, Inc. v. Cooper Power Tools, Inc.*, 543 F. Supp. 2d 749, 763 (E.D. Mich. 2008) (quoting *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003)). Because GM's statements "were motivated by legitimate business reasons, its actions [do] not constitute improper motive or interference," *id*. (quoting *Mino*, 661 N.W.2d at 597), and Plaintiffs have failed to allege any affirmative acts to corroborate their theory that GM's statements were malicious.

Third, and perhaps most importantly, Plaintiffs' big-picture argument that GM intentionally interfered with their economic expectancy is fatally flawed for the most basic reason: they are not arguing that GM's statements were intentional. The essence of Plaintiffs' argument is that GM misinterpreted the ATLA and then made statements relying on a "non-existent" consent right, so Plaintiffs are arguing that GM's statements were the result of a mistake. Because intentional interference requires more than purposeful or knowing behavior by GM, *Wausau Underwriters*, 323 F.3d at 404, the element certainly would require more than a mistake on GM's part, if one had even been made.

Therefore, Plaintiffs have failed to establish that GM intentionally interfered with their alleged economic expectancy. GM's statements were made within its contractual consent right and concerned legitimate business reasons for not consenting to the Framework Agreement, and thus cannot constitute per se wrongful or malicious acts. Even if GM had misinterpreted the

ATLA and GM did not actually have the consent right that it claimed regarding the Framework Agreement, Plaintiffs' argument still fails as a matter of law because GM's statements would have at most amounted to a mistake. Because we find that Plaintiffs have failed as a matter of law to establish that GM intentionally interfered with their alleged economic expectancy, we need not address whether Plaintiffs had a valid business expectancy in the Framework Agreement.

**AFFIRMED**.