RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0207p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HOBART-MAYFIELD, INC.,

　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

NATIONAL OPERATING COMMITTEE ON STANDARDS
FOR ATHLETIC EQUIPMENT, et al.,

　　　　　　　　　　　*Defendants-Appellees*.

┐
│
│
│
├　No. 21-1441
│
│
│
┘

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-12712—Gershwin A. Drain, District Judge.

Argued:  January 18, 2022

Decided and Filed:  September 9, 2022

Before:  SILER, COLE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Allen R. Bachman, K&L GATES, LLP, Washington, D.C., for Appellant.  David A. Ettinger, HONIGMAN LLP, Detroit, Michigan, for Appellees.  **ON BRIEF:**  Allen R. Bachman, K&L GATES, LLP, Washington, D.C., Christopher M. Wyant, K&L GATES, LLP, Seattle, Washington, for Appellant.  David A. Ettinger, HONIGMAN LLP, Detroit, Michigan, Rodger K. Carreyn, Christopher G. Hanewicz, Gabrielle E. Bina, PERKINS COIE LLP, Madison, Wisconsin, Jeffrey B. Morganroth, MORGANROTH & MORGANROTH, PLLC, Birmingham, Michigan, David A. White, DAVIS & WHITE, LLC, North Andover, Massachusetts, Michael G. Brady, WARNER NORCROSS & JUDD LLP, Southfield, Michigan William S. Cook, Jennifer A. Morante, WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, Livonia, Michigan, for Appellees.

————————————

**OPINION**

————————————

SILER, Circuit Judge.    Plaintiff Hobart-Mayfield, Inc. (Mayfield) is the maker of a football helmet accessory.  The accessory is purported to reduce the severity of football helmet impact when it is installed on an existing football helmet.  Defendants are National Operating Committee on Standards for Athletic Equipment (NOCSAE); Riddell, Inc. (Riddell); Kranos Corp. (d/b/a/ Schutt Sports); and Xenith, LLC (Xenith) (collectively "Helmet Manufacturers").  NOCSAE is a nonprofit organization that develops and promotes safety standards for athletic equipment.   It has a safety certification that can be applied to football helmets that meet NOCSAE's standards.  Helmet Manufacturers are makers of football helmets.  Mayfield filed a complaint alleging that NOCSAE and Helmet Manufacturers are restraining trade in the football-helmet market, engaging in an overarching conspiracy to limit competition, and subjecting Mayfield to tortious interference of business relationships or expectations. Mayfield's complaint was met with Defendants' Rule 12(b)(6) motion to dismiss on the basis that Mayfield failed to state a claim for plausible relief.   The district court granted Defendants' motion to dismiss. We **AFFIRM**.

**I.**

*Factual Background.*    Mayfield is the maker and seller of a football helmet accessory, commonly called an Add-on, named the "S.A.F.E.Clip," which is designed to be a shock absorber for football helmets.[1]   The S.A.F.E.Clip can be retrofitted to most football helmets in the aftermarket and it purports to reduce the degree of harmful impacts to a football player's helmet when used on the field.  Mayfield claims that its product has been "extensively tested and refined" between 2016 and 2018 and "resulted in force reductions as high as 35% per hit." Reducing the impact to the helmet theoretically enhances player safety. Mayfield was formed in 2014 and received a full patent for the S.A.F.E.Clip in 2017.

————————————

[1]S.A.F.E. stands for Shock Absorbing Football Equipment.

One Defendant, NOCSAE, is a nonprofit organization that "develops voluntary performance and test standards for athletic equipment" that can then be used by any athletic regulatory body that oversees athletic equipment. NOCSAE created standards for evaluating and certifying football helmets and faceguards which have been adopted by virtually all football leagues. Further, both parties agree that most football regulatory bodies require players from youth leagues to the National Football League (NFL) to use football helmets and masks that adhere to NOCSAE standards. Unquestionably, NOCSAE plays a significant role in the athletic equipment safety market. Mayfield argues that NOCSAE's role is anti-competitive because equipment not meeting NOCSAE standards is "almost entirely excluded from the respective markets for football helmets and football helmet Add-ons."

Football helmets that meet NOCSAE safety standards can be stamped with a visible, trademarked NOCSAE logo and safety phrase. The use of the NOCSAE logo and language on a football helmet is provided through a licensing agreement with the football helmet manufacturer. Helmet Manufacturers Riddell, Kranos, and Xenith all use the NOCSAE logo and language on their helmets. Mayfield alleges that Helmet Manufacturers control nearly the entire football helmet and helmet Add-on market. Mayfield further contends the dynamic between NOCSAE and Helmet Manufacturers creates conditions that preclude entry of the S.A.F.E.Clip to the football helmet Add-on market.

NOCSAE published press releases in 2013 and 2018 relating to its certification of helmets with Add-on products attached. The 2013 press release states:

> The addition of an item(s) to a helmet previously certified without those item(s) creates a new untested model. Whether the add-on product changes the performance or not, the helmet model with the add-on product is no longer "identical in every aspect" to the one originally certified by the manufacturer.

> When this happens, the manufacturer which made the original certification has the right, under the NOCSAE standards, to declare its certification void. It also can decide to engage in additional certification testing of the new model and certify the new model with the add-on product, but it is not required to do so.

Notably, the press release specified that addition of an Add-on product to a previously NOCSAE-certified helmet creates a new, untested product. The press release also stated that a

helmet manufacturer has the option of voiding the NOCSAE certification or seeking a new certification with the Add-on product applied to the helmet. Regarding makers of an Add-on product, the 2013 NOCSAE press release stated "[they] have the right to make their own certification of compliance with the NOCSAE standards on a helmet model, but . . . the certification and responsibility for the helmet/third-party product combination would become theirs, (not the helmet manufacturers)." In effect, either a helmet manufacturer or an Add-on manufacturer reserved the right to seek NOCSAE certification on a helmet/Add-on combination, but neither would automatically be entitled to a new certification without additional testing.

The issue of helmet/Add-on combinations was again addressed in a 2018 NOCSAE press release. Relevant portions of that statement read:

> The addition of an item(s) to a helmet previously certified without the item(s) creates a new untested model. Whether the add-on product improves the performance or not, the helmet model with the add-on product is no longer "identical in every aspect" to the one originally certified by the manufacturer.
>
> .......
>
> When this happens, the helmet manufacturer has the right, under the NOCSAE standards, to declare its certification void. It may elect to allow the certification to remain unaffected, or it may also decide to engage in additional certification testing of the new model and certify the new model with the add-on product, but it is not required to do so.

The key distinction between the 2013 and 2018 press releases is that the former permits either a helmet manufacturer or an Add-on product manufacturer to seek, independently, a NOCSAE safety certification, whereas the latter limits seeking certification to only helmet manufacturers.

Mayfield argues this policy cedes too much market power to the Helmet Manufacturers. Mayfield contends that NOCSAE's grant of a unilateral right to Helmet Manufacturers to void a NOCSAE safety standard certification when an Add-on product is attached to a helmet is a violation of the Sherman Act and the Michigan Antitrust Reform Act as well as tortious interference with business relations.

*Procedural Background.* Mayfield filed its initial complaint against Defendants, NOCSAE and Helmet Manufacturers, in 2019 in the United States District Court for the Eastern District of Michigan. The district court granted Mayfield's Motion for Leave to File an

Amended Complaint.  Mayfield filed its First Amended Complaint (FAC) in 2020 alleging two separate violations of Sherman Act § 1 and the Michigan Antitrust Reform Act (Counts I and II), and tortious interference (Counts III-VI).  Defendants then moved to dismiss Mayfield's FAC under Federal Rule of Civil Procedure 12(b)(6).  The district court dismissed the case.

## II.

We review an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) de novo.  *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 599 (6th Cir. 2016); *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006).

Rule 12(b)(6) motions are decided under the *Iqbal-Twombly* standard.  The complaint must meet the pleading requirements set forth in Federal Rule of Civil Procedure 8(a)(2).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).  The requirement of Rule 8(a)(2) is that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The claims made must be factually substantiated and, if accepted as true, "plausible on [their] face."  *Id.* at 570; *see also Iqbal*, 556 U.S. at 678-80.  Courts must construe a complaint in the light most favorable to a plaintiff and accept the plaintiff's factual allegations as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

Although factual allegations are accepted as true, a plaintiff's legal conclusions stemming from those factual allegations are open to scrutiny.  *Iqbal*, 556 U.S. at 678.  To survive a Rule 12(b)(6) motion to dismiss, a complaint's legal conclusions must be plausible considering the factual allegations made.  *Id.*  A plaintiff must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

## III.

The crux of Mayfield's complaint rests on the ability of Helmet Manufacturers to decertify the NOCSAE safety certification on their helmets or void the warranty on their helmets

if an Add-on product, like the S.A.F.E.Clip, is attached to one of their helmets.  Mayfield argues that this policy, combined with the oligopolistic nature of the football helmet market, creates anti-competitive and collusive conditions that deliberately restrain Mayfield from selling its S.A.F.E.Clip.

To make its case, Mayfield claims in Counts I and II of its complaint that Defendants violated § 1 of the Sherman Act, which forbids conspiracies in "restraint of trade or commerce among the several States."  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting 15 U.S.C. § 1); *see also Watson Carpet & Floor Covering Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011).  Mayfield also claims that Defendants violate the Michigan Antitrust Reform Act, but "because the Michigan Anti-Trust statute and the Sherman Anti-Trust Act mirror each other, [the court] appl[ies] the same analysis to both the federal and the state antitrust claims."  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 368 n.1 (6th Cir. 2003).  Mayfield's Michigan Antitrust Reform Act claims prevail or fail in tandem with its Sherman Act claims.  We analyze Mayfield's allegations in turn.

A.

To establish a violation of § 1 of the Sherman Act a plaintiff must demonstrate that there is: 1) an agreement, which may be in the form of a contract, combination, or conspiracy; 2) affecting interstate commerce; 3) that imposes an unreasonable restraint on trade.  *See White & White, Inc. v. Am.* Hosp. Supply Corp., 723 F.2d 495, 504 (6th Cir. 1983); *see also United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 671 (E.D. Mich. 2011).  Determining if a restraint is unreasonable rests on either a *per se* rule or the "rule of reason."  *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 469 (6th Cir. 2005).  Mayfield argues the restraint at issue is unreasonable under the "rule of reason" test, but also contends the district court erred by not analyzing the question under the *per se* rule.  Because Mayfield rests its arguments on the "rule of reason" test, we will assess only its validity.

To state a claim for relief under the rule-of-reason test, "a plaintiff must include in the complaint allegations demonstrating: (1) the defendants [agreed] or conspired among each other;

(2) the [agreement] or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) the objects of conduct pursuant to that contract or conspiracy were illegal; and (4) the plaintiff was injured as approximate result of the conspiracy." *Total Benefits Plan Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (internal quotations omitted); *see also Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010) ("To state a claim [for relief] under the rule-of-reason test, a plaintiff must allege . . . that the purportedly unlawful contract, combination, or conspiracy produced adverse anticompetitive effects within relevant product and geographic markets." (internal quotations omitted)).  We ask whether Mayfield satisfied this test for each of its Sherman Act claims.

*Count I.* Our assessment of Mayfield's Count I claim begins—and largely ends—with the agreement prong.  "To plead unlawful agreement, a plaintiff may allege either an explicit agreement to restrain trade, or 'sufficient circumstantial evidence tending to exclude the possibility of independent conduct.'"  *Watson Carpet*, 648 F.3d at 457 (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009)).  Here, Mayfield alleges an explicit agreement "by the Appellees to exclude Add-on products from the market through the NOCSAE Licensing Agreements and the 2018 NOCSAE de-certification policy."  "Under either [the explicit agreement or the circumstantial evidence] approach, the facts alleged must 'plausibly suggest[],' rather than be 'merely consistent with,' an agreement to restrain trade in violation of the Sherman Act."  *Watson Carpet*, 648 F.3d at 457 (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 907).

On the first prong of whether there is an agreement, Mayfield contends that an agreement was created between NOCSAE and Helmet Manufacturers in a two-step process.  First, by the written contracts with Riddell, Schutt Sports and Xenith "whereby [NOCSAE] licenses sports equipment manufacturers the right to market football helmets as certified to satisfy NOCSAE's standards."  Second, Mayfield argues an agreement formed when NOCSAE "promulgated written policies that changed the manner in which the License Agreements operated, thereby amending the terms of the Licensing Agreements."  The "written policies" at issue are the 2013 and 2018 NOCSAE press releases.  "Through these policies, NOCSAE eventually granted

Helmet Manufacturers the right to void a NOCSAE certification when Add-on products were incorporated *even where the products met or exceeded all NOCSAE standards*."

Mayfield characterizes the 2013 and 2018 NOCSAE press releases as modifications of the license agreements. Defendants disagree and contend that the press releases are not modifications of their license agreements with NOCSAE. Mayfield admits the press releases are "beyond the four corners" of the license agreements. Anticipating the Defendants will argue the press releases are not incorporated into the license agreements, Mayfield offers that such a dispute is to be resolved in favor of Mayfield for purposes of deciding a Rule 12(b)(6) motion to dismiss. Procedurally this is persuasive; substantively it is not.

Mayfield has not pleaded sufficient facts suggesting that NOCSAE collaborated with Helmet Manufacturers in either the 2013 or 2018 press releases. It has not offered evidence demonstrating that Defendants assented to either press release as a modification of the underlying license agreements. One document is a written agreement between NOCSAE and Helmet Manufacturers concerning the use of NOCSAE's intellectual property, and the other documents are unilateral publications by NOCSAE articulating the rights of athletic equipment makers when it comes to treatment of Add-on products for equipment already tested and approved for NOCSAE certification. It is unclear whether Helmet Manufacturers even agreed with the policy changes put forth by NOCSAE in the 2018 press release. The test under *Watson Carpet* is that an agreement between alleged conspirators can be either explicit or exhibited by sufficient circumstantial evidence. 638 F.3d at 457. Mayfield rests on the argument that the agreement was explicit; this is not compelling. The plaintiff in *Watson Carpet* sufficiently demonstrated that the defendants were actively working together to exclude the plaintiff from the market. *Id.* at 455. Defendants in that case made public, defamatory accusations about plaintiff and refused to sell any of its products. *Id.* Mayfield has not pleaded any facts that are comparable to the allegations demonstrated in *Watson Carpet*.

At day's end, Mayfield asks us to at best infer and at worst speculate that the origin and motive of the 2018 NOCSAE press release was part of a larger design created by the Defendants to restrain trade. An "explicit agreement" should not demand this kind of intellectual leap. Because Mayfield has failed to "plausibly suggest" that NOCSAE and Helmet manufacturers

entered into an "agreement to restrain trade in violation of the Sherman Act," we reject its Count I claim.  *See id.* at 457 (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 907).

*Count II*. Mayfield also alleges that a separate agreement exists among Appellees "to exclude all Add-on products from the relevant markets."  This agreement is not a written agreement; rather, it is an agreement "based on circumstantial evidence: parallel conduct by Appellees and so-called 'plus factors' that plausibly suggest an agreement to restrain trade in violation of the Sherman Act."  *See also Watson Carpet*, 648 F.3d at 457.  The parallel conduct according to Mayfield is Defendants' "refusal to sell a NOCSAE-certified helmet or NOCSAE certification to customers in order to coerce them not to buy Add-ons."  Mayfield argues this "restraint is unlawful as a 'group boycott' under both the *per se* and 'rule of reason' standards."

To prevail under these theories Mayfield must demonstrate "some setting suggesting the agreement necessary to make out a § 1 claim" under the Sherman Act.  *Twombly*, 550 U.S. at 557.  "[W]ithout that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory."  *Id*.  To illustrate such circumstances, a plaintiff must provide "plus factors" to support plaintiff's allegation that the actions of the Defendants are not independent.  *In re Travel Agent Comm'n Antitrust Litig*., 583 F.3d at 907. This court has outlined the following as "plus factors": "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire."  *Id*.

Mayfield begins its argument that Defendants are involved in an overarching conspiracy as a per se violation of § 1.  Mayfield rightly points out that "[c]ertain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused."  *In re Cardizem CD Antitrust Litig*., 332 F.3d 896, 907 (6th Cir. 2003) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)). If the per se rule is applicable then "no consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition."  *Id*. at 906 (quotation omitted).  Mayfield again argues

that the Helmet Manufacturers control the market for NOCSAE-certified helmets, as well as replacement and accessory items for those helmets, and that they use their discretion under the 2018 NOCSAE press release to void or threaten to void NOCSAE certifications whenever an Add-on is used.  Mayfield suggests this is a boycott of Add-on customers, but Mayfield does not provide any evidence suggesting that its product has been harmed by Helmet Manufacturers.  At best, Mayfield points to concern among Helmet Manufacturers that some Add-on products may not be safe and should be rejected without strong assurance that they can be used safely in an activity known for its risk of serious head injury.  This context does not "invest[] either the action or inaction alleged with a plausible suggestion of conspiracy." *Twombly*, 550 U.S. at 566.  Furthermore, activity designed to "establish and enforce reasonable rules in order to function effectively" is not illegal activity.  *NW Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 296 (1985).

Mayfield attempts to bolster its group boycott theory with nine plus factors.  Those plus factors are as follows.

First, Mayfield says the Helmet Manufacturers control and direct NOCSAE's board decisions.  "For example, the FAC alleges that NOCSAE's Vice President, Gregg Hartley, serves on NOCSAE's Board of Directors *as a representative* of the Sports & Fitness Industry Association, an organization controlled by Riddell's CEO and President, Dan Arment."  Mayfield does not allege Hartley's role resulted in collusion with Helmet Manufacturers or served an effort to restrain trade.  This is not compelling circumstantial evidence of an overarching conspiracy.  *See Monsanto Co. v. Spray Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

Second, Mayfield claims the 2013 NOCSAE press release "facially permitted Add-on manufacturers to obtain NOCSAE certification" but discriminated against Add-on producers for imposing more costs and burdens on their testing standards.  The claim here is that NOCSAE testing requirements required Mayfield to submit more helmets with the S.A.F.E.Clip for testing than the number of helmets typically submitted by Helmet Manufacturers for safety testing.  Mayfield makes no effort to explain how this illustrates a conspiracy among Defendants to disadvantage Mayfield.  Rather, Mayfield asks the court to speculate that collusion explains the different testing standards.

Third, Mayfield contends the 2018 NOCSAE de-certification press release was developed to hurt Mayfield because it had recently shown S.A.F.E.Clip testing compliance. Mayfield offers nothing to support this allegation and falls victim to the classic logical fallacy *post hoc ergo proctor hoc* (after this, therefore because of this): simply because the 2018 press release followed the S.A.F.E.Clip's testing compliance does not mean the press release was issued in response to it.

Fourth, Mayfield claims NOCSAE directed Add-on manufacturers to do business with the Helmet Manufacturers. Mayfield presents this factor as an attempt by NOCSAE's David Halstead to discourage Add-on manufacturers from going to market without working with the Helmet Manufacturers first on safety testing. Again, Helmet Manufacturers have an interest in the credibility and safety of their products, and it is not inconceivable that it would be prudent to work with Helmet Manufacturers on testing a product designed to be added to their existing helmet so that it can be used safely. Instead, Mayfield asks us to conclude that this evidences an overarching conspiracy against Add-on manufacturers.

Fifth, Mayfield states that NOCSAE directed customers away from Add-on products. The facts offered in support of this allegation stem from David Halstead telling a high school football coach over email that a helmet's warranty could be voided if an Add-on product was added to a helmet without approval from the manufacturer. Mayfield asks the court to conflate explaining the mechanics of helmet warranties and safety certifications protocols with a conspiracy to discourage consumers from purchasing Mayfield's products.

Sixth, Mayfield contends NOCSAE acted contrary to its economic interests by not certifying helmet/Add-on combinations and thereby increasing its "revenue from licensing fees." It is unclear from Mayfield's brief whether certifying helmet/Add-on combinations would increase "revenue from licensing fees" for NOCSAE, particularly considering NOCSAE's nonprofit status. Moreover, as Defendants rightly point out, NOCSAE has a vested interest in protecting its credibility by maintaining strict safety standards. To do anything contrary would undermine its core mission. Perhaps there is an avenue for NOCSAE to certify helmet/Add-on combinations without diluting its standards, but Mayfield does not explain how NOCSAE might achieve that goal or whether it would be economically feasible. Again, Mayfield asks the court

to observe a scenario and conclude that the only proper explanation for it is a conspiracy among Defendants, but Mayfield offers the court nothing but speculation to support that conclusion. This falls short of the plausibility burden that Mayfield must meet to overcome a Rule 12(b)(6) motion to dismiss.

Seventh, Mayfield states that Defendants exchanged confidential information about Add-on products. To argue this plus factor, Mayfield offers two examples: (1) that Helmet Manufacturers and NOCSAE are members of similar trade organizations and attend the same trade shows; and (2) that engineers from Xenith and Schutt Sports exchanged emails discussing the safety of an early model of the S.A.F.E.Clip. Mayfield relies on *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 394 F. Supp. 3d 509, 531-32 (E.D. Pa. 2019), to claim that shared membership in trade associations demonstrates parallel conduct in trying to fix prices on generic drugs. However, in *Generic Pharma* the court also found that defendants had spoken about fixing the price of at least one drug. *Id.* at 532. Mayfield relies on an exchange between helmet engineers at Xenith and Schutt Sports to support its theory. However, the discussion concerned the safety of the S.A.F.E.Clip, not how to keep the S.A.F.E.Clip out of the marketplace. Mayfield asks the court to infer that the two are indistinct, but that is not persuasive. Helmet Manufacturers have a legitimate interest in evaluating the safety of their equipment with or without Add-on products. Mayfield contends the communication between the engineers violated a nondisclosure agreement between Mayfield and Schutt Sports and that "[t]he only explanation for employees of Schutt Sports and Xenith breaching a nondisclosure agreement in order to discuss the S.A.F.E.Clip was to coordinate their opposition to the product and further lessen competition from Mayfield Athletics and other Add-on manufacturers." The obstacle for Mayfield is that even if the nondisclosure agreement violation is accepted as true, collusion is not the only explanation for breaching it. The engineer, according to Mayfield, stated that the original S.A.F.E.Clip "result[ed] in facial contact of the guard to the chin which as you know is considered a failure." Mayfield asks us to read this statement as ostensibly about safety when it is, in fact, evidence of a conspiracy to deny them market access. This is speculative.

Eighth, Mayfield asserts the helmet market is ripe for collusion "because Appellees control nearly 100% of the market." Being ripe for collusion, or having a market where collusion is simply possible, is not evidence of collusion. The Seventh and First Circuits have both rejected this kind of blanket assertion. *See White v. R.M. Packer Co., Inc.* 635 F.3d 571, 580 (1st Cir. 2011); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp*., 971 F.2d 37, 50, 53 (7th Cir. 1992). Mayfield does not show that the oligopolistic market for football helmets is animated by collusive agreements or interdependent decision making. Instead, Mayfield asks the court to speculate that Helmet Manufacturers conspire to eliminate competition simply because they control most of the market. This is a conclusion without support.

Finally, Mayfield argues that Helmet Manufacturers have "strong incentives to collude and exclude Add-on products." "If firms develop innovative safety technology in the form of Add-ons, the availability of those products may be used as evidence against the Helmet Manufacturers in product liability cases." This is conjecture. Mayfield also suggests that Defendants have a "motive to conspire to eliminate Add-ons because, if customers could affix Add-ons to helmets, they would do so in order to improve their helmets." This, according to Mayfield, would extend the life of current helmets and reduce the demand for new helmets and reduce Helmet Manufacturers revenue. Again, this conjecture asks the court to imagine a marketplace that does not exist and conclude that it does not exist because Defendants conspired to prevent it from existing.

Mayfield argues there is an overarching conspiracy in violation of Sherman Act § 1 because of both a per se and a rule of reason violation bolstered by nine "plus factors." This pleading is inadequate. In each circumstance Mayfield draws the court's attention to a scenario, theory, or occurrence and asks the court to make sweeping conclusions about the motives and actions of Defendants. We are not persuaded to follow Mayfield's argument.

B.

The remaining counts name each Defendant (Schutt Sports, Riddell, Xenith, and NOCSAE, respectively) as a tortfeasor in tortious interference of business relationships or expectations claims. These claims are brought under Michigan law. The elements for tortious

interference are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by defendant; (3) an intentional interference by defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the plaintiff. *Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 538-39 (Mich. Ct. App. 2005). In each count Mayfield argues that the Defendants used their right to decertify a helmet or void its warranty to interfere with Mayfield's business relationships or expectancy.

Mayfield argues that customers expressed reluctance to use the S.A.F.E.Clip out of fear that it would void the warranty of the helmet(s) used by those customers, or likewise result in the decertification of the helmet's NOCSAE safety certification. For these claims to overcome a motion to dismiss Mayfield must adequately allege the existence of a valid business relationship or expectancy and improper motive or interference by the Defendants. Mayfield argues it had a valid business expectancy because it was in talks with a variety of football teams to purchase the S.A.F.E.Clip but those expectations were not fulfilled because the potential customers were reluctant to use the S.A.F.E.Clip if it meant their helmet warranty might be voided. This does not meet the standard for tortious interference under Michigan law. "The expectancy must be a reasonable likelihood or probability, not mere wishful thinking." *Trepel v. Pontiac Osteopathic Hosp.*, 354 N.W.2d 341, 348 (Mich. Ct. App. 1984). A plaintiff "must show that they had more than a 'subjective expectation of entering into a [business] relationship." *Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 789 (E.D. Mich. 2013) (quotation omitted), *aff'd*, 770 F.3d 436 (6th Cir. 2014). Mayfield does not provide evidence that these business opportunities were nearing consummation. Rather, Mayfield's description of these opportunities is that the customers declined to purchase the S.A.F.E.Clip because doing so could void the warranty on the helmets they were using. This is more akin to wishful thinking than a reasonable likelihood of forming a business relationship with these parties.

If Mayfield is given the benefit of the doubt that these business relationships were likely to be realized, then it must still demonstrate that Defendants interfered with those business relationships. In *Saab Auto*, we explained that "[i]ntentional interference requires more than just purposeful or knowing behavior on the part of the defendant. [A] plaintiff must also allege that the interference was either (1) a *per se* wrongful act or (2) a lawful act done with malice and

unjustified in law for the purpose of invading the . . . the business relationship of another." 770 F.3d at 441 (citations and quotations omitted). Here the Defendants have made policy pronouncements and echoed those pronouncements in their dealings. The motive for these pronouncements has been to protect their brand credibility and the safety of their products. Mayfield has not demonstrated that Defendants have acted with malice or in a wrongful manner to thwart Mayfield's business dealings. "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id.* at 442 (citation and quotation omitted). Defendants have shown that their desire to protect their reputations and sell safe products is a legitimate business interest. That this high standard creates barriers to entry for Mayfield illustrates only that Mayfield has elected to sell products in a market that places high regard on the safety and warranty of its products, not that the market is rife with tortious interference.

**AFFIRMED**.